**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| **MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,** | |
| **Plaintiff,** | |
| **v.** | |
| **JAMES D. DONDERO; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; and SAS ASSET RECOVERY, LTD.** | Adv. Pro. No. 21-03076-sgj <br><br> **Civil Action No. 3:22-CV-203-S** <br><br> *Consolidated with:* <br> Case No. 3:22-CV-229 <br> Case No. 3:22-CV-253 <br> Case No. 3:22-CV-367 <br> Case No. 3:22-CV-369 <br> Case No. 3:22-CV-370 |
| **Defendants.** | |

## DEFENDANTS' RESPONSE TO MOTION TO LIFT STAY

Defendants NexPoint Advisors, L.P., NexPoint Asset Management, L.P. f/k/a Highland Capital Management Fund Advisors, L.P., James Dondero, The Dugaboy Investment Trust, Get Good Trust, Strand Advisors, Inc., Scott Ellington, and Isaac Leventon (collectively, "Defendants") file this Response to Motion to Lift Stay [Doc. 48], as follows:

CORE/3524885.0002/245491350.2

## I.    RESPONSE

On June 24, 2026, Plaintiff Hunter Mountain Investment Trust ("HMIT") filed a Motion to Lift Stay ("Motion"), requesting that the Court lift the stay imposed by the Court's May 7, 2026, order [Doc. 44] ("Stay Order"), which stayed these proceedings pending a ruling by Judge Odell on Dugaboy's Motion for Relief from Order and Motion to Vacate [BK. Doc. 4513] ("Motion to Vacate") filed in the Bankruptcy Court.

The parties filed a joint notice of Judge Odell's ruling denying Dugaboy's Motion to Vacate on June 17, 2026 [Doc. 45]. Subsequently, on June 29, 2026, Dugaboy filed a Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate [BK. Doc. 4684] ("Motion to Alter"), asking Judge Odell to alter, amend, or otherwise reconsider the denial of Dugaboy's Motion to Vacate for multiple reasons. A true and correct copy of this Motion to Alter is attached as **Exhibit 1**.

Defendants request that this Court await resolution of Judge Odell's ruling on the Motion to Alter before lifting the stay in this case because the assignment of claims to Plaintiff HMIT may not survive if Judge Odell rules against HMIT. The Motion to Alter is straightforward, and Defendants expect Judge Odell to rule promptly. A short delay in this proceeding will not prejudice any party as this case has been stayed for many years, and there is no pressing need to lift the stay until after a ruling on the Motion to Alter.

## II.    CONCLUSION

For the foregoing reasons, Defendants request that the stay of this proceeding continue until Judge Odell issues a ruling on the Motion to Alter.

July 8, 2026                    Respectfully submitted,

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
deborah.deitschperez@stinson.com
michael.aigen@stinson.com

*Counsel for Defendants NexPoint Advisors, L.P.*
*and NexPoint Asset Management, L.P.*
*f/k/a Highland Capital Management Fund Advisors,*
*L.P.*

*/s/ Amy L. Ruhland*
Amy L. Ruhland
Texas Bar No. 24043561
amy.ruhland@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
401 W 4th Street, Suite 3200
Austin, TX 78701
(512) 580-9600

*Attorneys for James Dondero, The Dugaboy*
*Investment Trust, Get Good Trust, and The Strand*
*Advisors, Inc.*

*/s/Debra A. Dandeneau*
(Admitted *pro hac vice*)
Michelle Hartmann
State Bar No. 24032402
BAKER & MCKENZIE LLP
1900 North Pearl, Suite 1500
Dallas, Texas 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Michelle.hartmann@bakermckenzie.com

and

Debra A. Dandeneau
BAKER & MCKENZIE LLP
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Debra.dandeneau@bakermckenzie.com
(Admitted *pro hac vice*)

*Counsel for Scott Ellington and Isaac Leventon*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on July 8, 2026, a true and correct copy of this document was served electronically via the court's CM/ECF system.

/s/Deborah Deitsch-Perez
Deborah Deitsch-Perez

# Exhibit
# 1

Michael J. Edney
Martha B. Stolley
Avery Joseph Welker
Morgan Lewis Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
martha.stolley@morganlewis.com
avery.welker@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054-sgj |
| Debtor. | |

**THE DUGABOY INVESTMENT TRUST'S MOTION TO ALTER OR AMEND AND
FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM
ORDER AND MOTION TO VACATE**

1934054260629000000000001

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 3

III.  LEGAL STANDARD........................................................................................ 7

IV.  ARGUMENT .................................................................................................... 9

      A.    The Evidence of Mark Patrick Having Stolen the Assets of the Charitable DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence Newly Discovered After the 9019 Motion............................. 9

      B.    Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions, Misrepresentations, and Misconduct During Highly Restricted Discovery. ....... 19

      C.    Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable Structures to Avoid Rewarding Mark Patrick's Misconduct.............................. 23

V.    CONCLUSION................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*,
   173 F.Supp.3d 363 (N.D. Tex. 2016) .......................................................................................18

*Banister v. Davis*,
   590 U.S. 504 (2020).................................................................................................................7

*Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*,
   16 F. Supp. 2d 698 (N.D. Tex. 1998) .......................................................................................7

*In re Charitable DAF Holdco Ltd. (In Official Liquidation)*,
   No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1 ...........................................................5

*Charles L.M. v. N.E. Indep. Sch. Dist.*,
   884 F.2d 869 (5th Cir. 1989) ....................................................................................................7

*Demahy v. Schwarz Pharma, Inc.*,
   702 F.3d 177 (5th Cir. 2012) ....................................................................................................7

*Dupree v. Younger*,
   598 U.S. 729 (2023)..................................................................................................................2

*Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*,
   6 F.3d 350 (5th Cir. 1993) ...................................................................................................8, 23

*In re Endeavour Highrise, L.P.*,
   432 B.R. 583 (Bankr. S.D. Tex. 2010) ....................................................................................18

*Gen. Universal Sys., Inc. v. Lee*,
   379 F.3d 131,156–57 (5th Cir. 2004) ......................................................................................19

*Hamilton Plaintiffs v. Williams Plaintiffs*,
   147 F.3d 367 (5th Cir. 1998) ....................................................................................................6

*Heirs of Guerra v. United States*,
   207 F.3d 763 (5th Cir. 2000) ..................................................................................................18

*Inryco, Inc. v. Metro. Engr. Co., Inc.*,
   708 F.2d 1225 (7th Cir. 1983) ..................................................................................................7

*In re J.A.R. Concrete, Inc.*,
   673 B.R. 663 (W.D. Tex. 2025)...............................................................................................18

*In re Kakal*,
    2019 WL 1868626 (S.D. Tex. Bankr. 2019)..................................................................6

*Pruett v. Stephens*,
    608 Fed. Appx. 182 (5th Cir. 2015)........................................................................7

*Rhodes v. Amarillo Hosp. Dist.*,
    654 F.2d 1148 (5th Cir. 1981) ...............................................................................18

*Rismed Oncology Systems, Inc. v. Baron*,
    297 F.R.D. 637 (N.D. Ala. 2014).........................................................................21

*Shepherd v. Int'l Paper Co.*,
    372 F. 3d 326 (5th Cir. 2004) .................................................................................6

*Silas v. Sears, Roebuck & Co.*,
    586 F.2d 382 (5th Cir. 1978) ...................................................................................7

*In re Transtexas Gas Corp.*,
    303 F.3d 571 (5th Cir. 2002) ...................................................................................7

*Williams v. French*,
    2024 WL 3929894 (S.D. Tex. Aug. 23, 2024) .......................................................7

**Statutes**

Bankruptcy Code Chapter 15.......................................................................................5

**Rules**

Federal Rule of Bankruptcy Procedure 9019...................................................... *passim*

Federal Rule of Bankruptcy Procedure 9023.................................................................6, 7

Federal Rule of Bankruptcy Procedure 9023(a) ............................................................1

Federal Rule of Bankruptcy Procedure 9024................................................................1

Federal Rule of Civil Procedure 50(e) .........................................................................6

Federal Rule of Civil Procedure 59(e) ..............................................................1, 6, 7, 24

Federal Rule of Civil Procedure 60(b)...................................................................... *passim*

Federal Rule of Civil Procedure 60(b)(3) ................................................................ *passim*

Federal Rule of Civil Procedure 60(b)(6) ................................................................ *passim*

Rule 60(b)(2).......................................................................................................... *passim*

The Dugaboy Investment Trust ("Dugaboy") respectfully moves under Fed. R. Civ. P 59(e), as incorporated by Federal Rule Bankruptcy Procedure 9023(a), to alter or amend and otherwise to reconsider the Court's June 15, 2026 Order denying Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) (the "Denial Order"), as incorporated by Federal Rule Bankruptcy Procedure 9024.  The Court should alter its order to grant the motion to vacate the approval of the settlement between the Highland entities and the Hunter Mountain Investment Trust.

## I.     **<u>INTRODUCTION</u>**

The Court should alter, amend, and otherwise reconsider its denial of Dugaboy's motion for relief under Federal Rule of Civil Procedure 60(b) for multiple reasons.  The June 2025 order approving the settlement between the Highland-related entities and the Hunter Mountain Investment Trust should be vacated.

First, the Court's denial of Dugaboy's motion based on newly discovered evidence under Rule 60(b)(2) rests on an incorrect factual premise: That Mr. Dondero and his family trust already possessed the evidence of Mr. Patrick's theft of Charitable DAF on which the motion to vacate was based, as of April 16, 2025,.  April 16, 2025, is when Mr. Dondero filed an affidavit supporting the opening of liquidation proceedings in the Cayman Islands, proceedings that only much later revealed the outcomes, mechanisms, and motives of Mr. Patrick's brazen theft of the assets that had been maintained under a charitable structure that included the Hunter Mountain Investment Trust ("Hunter Mountain") and the equity position in Highland Capital Management, L.P. ("Highland").

The April 16, 2025, affidavit did not set forth the evidence of Mr. Patrick's fraudulent restructuring of the Charitable DAF, including his theft of the Highland equity position from an

established Dallas charity.  Instead, the affidavit detailed Mr. Patrick's lack of transparency with respect to this recent operation of the Charitable DAF and compliance lapses in areas separate and apart from his Charitable DAF restructuring efforts.  Mr. Patrick's brazen theft of all the assets of the charitable structures was instead first alleged by the Cayman Liquidators in a July 15, 2025, "statement of claim," with actionable evidence of those allegations later revealed in the Cayman proceedings and elsewhere.

Relief is also appropriate under Federal Rule of Civil Procedure 60(b)(3).  In its Denial Order, the Court held that no one had engaged in fraud or discovery misconduct in the proceedings leading up to the 9019 order in June 2025.  That is not so.  That process was unnecessarily rushed and frantic.  But Mark Patrick was deposed, and he lied in that deposition to conceal his theft of the charitable assets until the very last minute.

Finally, the Court should grant relief under Federal Rule of Civil Procedure 60(b)(6).  The fraud and misconduct is not adjacent to this Court's mission and charge.  We know today, due to the evidence elicited in the May 2026 hearings, that Mark Patrick came to this Court in May 2025 asking for approval to deal away stolen property to Highland.  That is because, by the time he had arrived, he had misappropriated Hunter Mountain and the residual equity position in Highland from the established charity to which it was given and belonged.  Having (albeit unwittingly) approved the transfer of stolen property is an anathema to justice and this Court's role as a court of equity, and that is a "reason" in addition to many others "that justifies relief."  Fed. R. Civ. P. 60(b)(6).

In addition, this Court has a special responsibility to monitor arrangements made between Highland's appointed managers and third parties.  That is because the predecessor bankruptcy judge stimulated the removal of Highland's founder and most effective guardian of its equity

2

interest in the first hearing after this case was transferred from Delaware.  And at the Court's

insistence, appointed managers effectively acting in the Court's stead followed.  If the Highland

managers made an arrangement with wrongdoers (either knowingly or not), that should be of

special concern to the Court.  Today, we know Mr. Patrick was a wrongdoer and the appointed

managers reached a settlement with him precisely because he was eager to advance and to deter

scrutiny into his wrongdoing.

Dugaboy limits this motion for reconsideration to these issues but reserves the right to

address additional errors in the appellate courts in the event the instant motion is not granted. See

*Dupree v. Younger*, 598 U.S. 729 (2023) (holding that parties are not required to renew legal

arguments to preserve them for appellate review).  Today, Dugaboy has also filed a notice of appeal

in an abundance of caution to ensure all timelines to secure future review if necessary.  The

Bankruptcy Rules provide that this Court retains jurisdiction to decide the motion to amend until

it is decided or withdrawn, despite the sequential filing of a notice of appeal.  Fed. R. Bankr. P.

8002(b)(2).

## II.   <u>BACKGROUND</u>

This motion arises from the Chapter 11 bankruptcy proceedings involving Highland.  On

May 19, 2025, Highland and Hunter Mountain moved for approval of a settlement pursuant to

Federal Rule of Bankruptcy Procedure 9019.  Dkt. 4216. Although Dugaboy challenged this

proposed settlement, *see* Dkt. 4230, it ultimately was approved on June 30, 2025. *See* Dkt. 4297

("9019 Settlement Approval Order").

Dugaboy filed a motion to vacate the settlement approval order under Federal Rule of Civil

Procedure 60(b).  Dkt. 4513 ("Rule 60(b) Motion").  Dugaboy moved for relief under Rule 60(b)(2)

based on newly discovered evidence, under Rule 60(b)(3) based on fraud, misrepresentations, and

misconduct by an opposing party, and under Rule 60(b)(6) for any other reason justifying relief. *Id.* at 33–43. With respect to its motion for relief under Rule 60(b)(2), Dugaboy directed the Court to developments in proceedings in the Cayman Islands that had occurred after the Court's hearing regarding and order approving the settlement agreement with Hunter Mountain. In those proceedings, the Grand Court of the Cayman Islands had appointed a form of receiver—what the Cayman legal system calls Joint Official Liquidators—to step into the shoes of one of the core, Cayman-incorporated entities at the heart of the Charitable DAF structure, the Charitable DAF Fund, L.P.

Mr. Dondero had established the Charitable DAF years earlier to create a legacy of good works in the community that would outlive him. May 21, 2026 Hr'g Tr. at 135:23–24. At the top of this structure were four charities that Mr. Dondero had selected, each with a decades-long track record for doing good. *Id.* at 136:24–137:8 (App. 115). They were to be the recipients of Mr. Dondero's generosity and the growth of the assets Mr. Dondero had given to the structure. And each had set up a structure—a so-called "supporting organization"—that would allow Mr. Dondero to have a significant say in how the charities used the proceeds from the DAF. May 21, 2026 Hr'g Tr. at 137:9–18; May 11, 2026 Hr'g Tr. at 208:1–12.

The Cayman Liquidators uncovered detailed, new, and breathtaking evidence of Mr. Patrick's stealing all the Charitable DAF's assets from the charities and from Mr. Dondero's ability to guide the good works to which they were to be put. Mr. Patrick proceeded to put them in his own pocket, in the hands of a sham "charity" run from his kitchen table. And along the way, he looted the charitable assets, paying himself more than $14 million in just over 18 months. He went out of his way to conceal his misconduct. The Cayman Liquidators uncovered communications instructing his co-conspirators to make the new entities "hard to find or track, or trace." *See*

4

Dugaboy Ex. 169 at 1 (App. 042).  And he told the charities that he was going to "leave the structure exactly as it was" and that transparency in the form of financial statements would be coming soon.  *See* Dugaboy Ex. 204 at 171-72 (App. 049– 050) ("Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter    .  .  .  [W]e are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF HoldCo governance structure."); *id.* at 167 (App. 045) ("[O]ur understanding was that we were to prepare a presentation for the Foundations to address these concerns."); *id.* at 179 (App. 057) (unanswered scheduling emails from charities' counsel).  All of this legerdemain occurred from late 2024 through the spring of 2025.

Mr. Patrick's theft of the Charitable DAF's assets had everything to do with the Hunter Mountain Investment Trust, which owned most of the equity in the Debtor, Highland Capital Management LP.  The Court will recall that on February 12, 2025, Mr. Patrick sold Hunter Mountain for $1 million to CLO HoldCo, LLC.  Dugaboy Ex. 15 at 1 (App. 027); May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110).  That entity was entirely owned by Charitable DAF LP and the entire Charitable DAF structure.  May 12, 2026 Hr'g Tr. at 72:11–13; *see also* Dugaboy Ex. 242 at 18 (App. 066).  Before the sale, all the value in Hunter Mountain was supposed to be entirely for the benefit of The Dallas Foundation.  Dugaboy Ex. 242 at 12 (App. 065).  After the sale, it became part of the Charitable DAF structure, which was to be owned by The Dallas Foundation and three other established charities, with Mr. Dondero having input as to the philanthropic ends for which his charitable gift would be used.  *Id.* at 14; May 21, 2026 Hr'g Tr. at 137:9–18.  But, on March 27, 2025, Mr. Patrick stole the Charitable DAF's assets—including Hunter Mountain

and the equity position in Highland Capital Management—from The Dallas Foundation and from Mr. Dondero's guidance.   Highland Ex. 63 at 53.   He did this through a secret transaction that dispossessed the established charities from the equity stake in Highland and $270 million in other assets in exchange for a mere $1.6 million, transferring hundreds of millions of dollars to the sham charity he set up in his basement.  *Id.*

The evidence documenting this perfidy came from the Cayman Liquidators, who were able to obtain it because they were empowered to step into the shoes of The Charitable DAF Fund, L.P., the core entity in the Charitable DAF, and obtain information in its name from Cayman government registrars, corporate service providers, and the company's own files.  May 11, 2026 Hr'g Tr. at 77:4–19.  Importantly, this fraud was largely pulled off in the Cayman Islands, by corporate entities outside the United States.  Unbeknownst to the predecessor bankruptcy judge in this case, by the time Mr. Patrick was trading away the property interests of the equity holders in Highland Capital Management, he was dealing in stolen property. The Court-appointed managers of Highland were receiving settlement of Hunter Mountain's claims from the very person who had stolen the assets from the charities they were meant to benefit.  And the Court was blessing it.

The Cayman Liquidators first alleged what they had uncovered in a Statement of Claim, filed on July 15, 2025.  That Statement contained only allegations, but those allegations were so earthshattering that Dugaboy asked the predecessor judge to stay the effect of her settlement approval ruling in light of them.  Dkt. 4326.  The evidence behind those allegations was presumptively confidential under Cayman law.  May 11, 2026 Hr'g Tr. at 77:16–19.  It was released later, beginning with the Liquidators' July 21, 2025, filing in Delaware bankruptcy court seeking Chapter 15 recognition of its proceedings and then in successive affidavits of Margot MacInnis (one of the joint liquidators), only made accessible in the weeks surrounding hearings in

6

the Cayman proceedings.  *See* Caymans Exhibit D, Chapter 15 Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Charitable DAF Holdco Ltd. (In Official Liquidation)*, No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1.  The full evidentiary record, thus, came into focus only in December 2025, less than three months before Dugaboy filed its Rule 60(b) motion.  *See* May 11, 2026 Hr'g Tr. at 78:4–21 (App. 085); Dkt. 4513 (Dugaboy's Feb. 9, 2026 Rule 60(b) motion).

On June 15, 2026, after full briefing and a three-day evidentiary hearing, this Court denied Dugaboy's motion to vacate.  Dkt. 4678.  With respect to the request for relief under Rule 60(b)(2), the Court ruled that the evidence presented at the May 2026 hearing was not "newly discovered" because Mr. Dondero had introduced evidence of Mr. Patrick's misconduct in an affidavit he filed on April 16, 2025—before the Rule 9019 hearing in June 2025.  *Id.* at 10–11.  The Court also denied relief under Rule 60(b)(3) on the grounds that the provision requires fraud or misconduct to have occurred in the judicial proceedings itself, and that Highland had not provided misleading or incomplete answers to inquiries in discovery leading to the Rule 9019 order.  *Id.* at 12–13. Finally, the Court denied relief under Rule 60(b)(6) by determining that Dugaboy did not present a basis for equitable relief that was separate from the grounds presented for Rules 60(b)(2) and 60(b)(3), and by determining that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain.  *Id.* at 13–14.

## III.   **LEGAL STANDARD**

While the Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration, a party seeking such relief may file a request that "may be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment or

7

order." *See Shepherd v. Int'l Paper Co.,* 372 F. 3d 326, 328 n. 1 (5th Cir. 2004) (citing *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998)).  If such a motion is filed within 14 days of the judgment or order of which the party complains, it is considered a Rule 59(e) motion. *In re Kakal*, 2019 WL 1868626, at *1 (S.D. Tex. Bankr. 2019) (citing *Shepherd*, 372 F.3d at 328 n.1).  *See also* Fed. R. Bankr. P. 9023 (incorporating Fed. R. Civ. P. 50(e) and requiring that a Rule 59(e) motion "be filed within 14 days after the judgment is entered).  Importantly, motions to alter or amend a judgment can be made with respect to orders denying or granting motions to vacate prior judgments under Rule 60(b). *See, e.g.*, *Charles L.M. v. N.E. Indep. Sch. Dist.*, 884 F.2d 869 (5th Cir. 1989); *Pruett v. Stephens*, 608 Fed. Appx. 182, 184 (5th Cir. 2015); *see also Inryco, Inc. v. Metro. Engr. Co., Inc.*, 708 F.2d 1225, 1232 (7th Cir. 1983) ("[D]enial of a Rule 60(b) motion is itself an appealable judgment…. Therefore, a losing party may challenge that judgment with a motion to alter or amend under Rule 59(e)").  Here, the Denial Order[1] was issued on June 15, 2026.  Dugaboy files this Motion on June 29, 2026, fourteen days after the Denial Order's issuance.  Accordingly, this Motion is a timely Fed. R. Civ. P. 59(e) motion under Fed. R. Bankr. P. 9023.

A Rule 59(e) motion "calls into question the correctness of a judgment," *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002), and "gives a district court the chance to rectify its own mistakes in the period immediately following its decision." *Banister v. Davis*, 590 U.S. 504, 508 (2020).  Under Fed. R. Civ. P. 59(e), amending or altering a judgment is appropriate (1) when there has been an intervening change in the controlling law; (2) where the movant presents newly discovered evidence that was previously unavailable; or (3) to correct a manifest error of law or

---

[1] The Denial Order of Dugaboy's Rule 60(b) motion is a final, appealable order.  *See Silas v. Sears, Roebuck & Co.*, 586 F.2d 382, 384 n.2 (5th Cir. 1978).

fact. *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012). In the Fifth Circuit, a "manifest error of fact" sufficient to warrant Rule 59(e) relief is one that is "an obvious mistake or departure from the truth." *Williams v. French*, 2024 WL 3929894, at \*3 (S.D. Tex. Aug. 23, 2024) (citing *Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*, 16 F. Supp. 2d 698, 712 (N.D. Tex. 1998)). In deciding a Rule 59(e) motion, this Court has "considerable discretion" but must "strike the proper balance between two competing imperatives: (1) finality and (2) the need to render just decisions on the basis of all facts." *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993).

## IV.    ARGUMENT

### A.    The Evidence of Mark Patrick Having Stolen the Assets of the Charitable DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence Newly Discovered After the 9019 Motion.

Mr. Dondero executed an affidavit on April 16, 2025. *See* Dugaboy Ex. 36 (App. 030–040). Its purpose was to support the three established charities at the top of the Charitable DAF structure in their request that the Cayman Islands Grand Court step in and appoint a neutral to run the key corporate entity at the heart of the structure, The Charitable DAF Fund, L.P.

Without question, that affidavit was not a hagiography of Mark Patrick. It asserted that Mr. Patrick had not been doing a great job when, in addition to his role with the Charitable DAF, he was also working for Skyview, an entity that provides legal and other services to Mr. Dondero's corporate entities.

The Court, however, manifestly erred in determining that the information that later arose from the Cayman proceedings—after the Caymans Liquidators stepped into the shoes of The Charitable DAF Fund, L.P.—was not "newly discovered" because of the assertions in the April 2025 affidavit. There is a yawning chasm between the criticisms of Mr. Patrick on other matters in that April 2025 affidavit and the conclusive and directly germane evidence of his theft of the

9

Charitable DAF assets—including *the equity position in the Debtor* and a quarter billion dollars in other assets—later uncovered in the Cayman proceedings.  Because of the timing of the revelation of that evidence by the Cayman Liquidators, the predecessor bankruptcy judge did not consider this significant evidence of misconduct, directly relevant to the equity interests that were attempting to compromise their claims in front of her.  By that point, unbeknownst to anyone but Mark Patrick and his co-conspirators, Mr. Patrick was dealing away stolen property right under the predecessor judge's nose.

<b>i.     The Dondero Affidavit Lacked Any Evidence of Mark Patrick's Theft of the DAF Structure.</b>

The April 2025 affidavit initiating the Cayman proceedings did not detail Mr. Patrick's theft of the Charitable DAF's assets.  It is important to be precise about what the April 2025 affidavit said.  That affidavit expressed concerns about two compliance issues in Mr. Patrick's past work, as well as his more recent lack of transparency regarding his operations of the Charitable DAF.

First, in late June 2023, Mr. Patrick sought to have the Charitable DAF make a $10,000 donation to a charity called Creative Hearts TX.  Dugaboy Ex. 36 at 4–5 (App. 034–035).  His wife and daughter were directors of Creative Hearts.  *Id.* at 5 (App. 035).  Also in June 2023, Mr. Patrick asked former FBI agent Kevin Cronin and his firm to charge $25,000-$50,000 in fees for financial advisory services and to split the proceeds with him.  *Id.*  Mr. Cronin promptly informed Mr. Dondero of Mr. Patrick's conduct.  Importantly, Mr. Dondero had addressed both of these issues in 2023 with Mr. Patrick and did not seek to remove him from his position at Skyview, his corporate services company, much less from the Charitable DAF.  Mr. Dondero believed Mr. Patrick's actions were inappropriate but did not warrant terminating Mr. Patrick.  Third, Mr. Patrick contacted one of the charitable entities, The Dallas Foundation, to advise the entity to

10

exercise a put option on one of its investments in a fund related to Mr. Dondero. *Id.* at 6–7 (App. 036–037). The advice was based on material non-public information Mr. Patrick had gained from his employment at Skyview. *Id.* The Dallas Foundation did not act on the advice, and informed Mr. Dondero. Mr. Patrick resigned from Skyview in October 2024 while Skyview was investigating the facts and potential compliance issues of the episode. *Id.*

With the background of these historical episodes, Mr. Dondero became concerned when Mr. Patrick began to avoid answering the charities' questions regarding the financial condition of the DAF. The affidavit recounted that Mr. Patrick and (who ultimately proved to be) his co-conspirators declined to provide information regarding its financial condition, while promising Mr. Dondero the structure would remain the same. *Id.* at 7–8 (App. 037–038); May 21, 2026 Hr'g Tr. at 144:23–145:1. Mr. Dondero also recounted the bits and pieces of information he had learned regarding recent transactions, including indications that Mr. Patrick had effected a sale of Beacon Mountain (and therefore of its wholly-owned subsidiary Hunter Mountain) for $1 million, but expressly noting that he lacked information regarding the other details of that transaction, including the identity of the buyer. *Id.* at 8 (App. 038). For these reasons, Mr. Dondero supported judicial appointment of a neutral steward for both Charitable DAF Holdco and The Charitable DAF Fund, L.P., who could then make sure that the Charitable DAF entities were being run correctly. *Id.* at 1 (App. 031), 9–10 (App. 039–040). *See also* Dkt. 4534-6 at 1.

Importantly, Cayman law does not require a showing of fraud or misconduct for the appointment of a liquidator. Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. at 71:11–18 (App. 078). Instead, a Cayman court may appoint a liquidator on a petition from a concerned creditor seeking independent review of the winding up of an insolvent company without more allegations. *Id.* ("Broadly, it's – your appointment comes about when a – in an insolvent case

11

where a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company.")

> ii.    Using Court-Appointed Authority over a Charitable DAF Entity, the Cayman Liquidators Uncover Mr. Patrick's Brazen Theft of Hundreds of Millions of Dollars in Charitable Assets.

What was revealed by the Cayman Liquidators was of a different character and severity far beyond anything mentioned in the April 2025 affidavit.  Because the Cayman Liquidators were able to take over management of a Charitable DAF entity, they obtained otherwise confidential records that were in the hands of Cayman government agencies, law firms, accounting firms, and advisors.  This unparalleled power revealed that *Mr. Patrick had stolen everything from the four established charities that owned the Charitable DAF* and had stuffed it into his own pocket.  The product of the Liquidators' investigation began to be revealed in a July 15, 2025, Statement of Claim.  As the chief liquidator testified in this Court, the Statement of Claim itself is not evidence in the Cayman judicial system, and it is not evidence in the United States; it is akin to a complaint— a series of allegations.  Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. 73:1–22 (App. 080) (stating a statement of claim requires "reasonable prospect of success on that claim" to initiate liquidation proceedings).  But it was backed by evidence that the Liquidators needed Cayman judicial permission or open proceedings to reveal.  *Id.* at 77:4–19 (App. 084); 78:6–21 (App. 085) (noting the circumstances which "lift[] the sort of privacy rules governing Cayman proceedings" and allowed the documents in connection with the Statement of Claim to be made public).  And that evidence was revealed through later filings in Delaware and in the Cayman Islands by the Liquidators.  In the May 2026 hearing, Ms. MacInnis was called to testify and that evidence was authenticated and admitted.

The Cayman Liquidators uncovered:

12

- That Mr. Patrick had embarked on a complicated scheme, starting in late 2024, to scramble the Charitable DAF by creating a series of new entities. *Id.* at 85:18–21 (App. 086); *compare* Dugaboy Ex. 242 at 2 (App. 064) *with* Dugaboy Ex. 242 at 18 (App. 066).

- That the object of Mr. Patrick's ultimately successful scheme was to exit the Dallas Foundation and three other charities from beneficial ownership—and Mr. Dondero from a say in the use for good works of—more than a quarter billion dollars in assets. May 11, 2026 Hr'g Tr. 128:7–11 (App. 098) (noting that the four original charities were "left with nothing"); Dugaboy Ex. 7 at 8 –9 (App. 012–014); *compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025).

- That the destination of the ill-gotten gains was a sham "charity" run from Mr. Patrick's basement, the so-called "DFW Charitable Foundation." Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 106:10–18 (App. 091) ("I understand [DFW Charitable Foundation's headquarters is] at Mark Patrick's residence") 128:12–14 (App. 098) (noting that DFW Charitable received the DAF's assets); *see also* Dugaboy Ex. 8; Dugaboy Ex. 13.

- That, as if stealing all the assets from the charities were not enough, Mr. Patrick was also diverting eight figures in charitable assets into his own bank account, ostensibly as compensation for running the Charitable DAF. Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 131:15– 23 (App. 101).

- That, if there were any doubt that DFW Charitable is a sham, it is easily dispelled by looking at what DFW has given away:  Less than $1 million during its 15 months of sitting on the charitable assets. Testimony of Margot MacInnis, May 12, 2026 Hr'g Tr. 83:18–21 (App. 114). At the same time, Mr. Patrick has used those assets to pay himself and his "directors" 20 times the amount he has given to charity. Testimony of Margot McInnis, May 12, 2026 Hr'g Tr. 82:5–14

(App. 113), 82:25–83:12 (App. 113–114).  And he has paid law firms and advisors millions more to arrange and then cover up his fraud.  May 12, 2026 Hr'g Tr. 75:13–76:9 (App. 111–112); Dugaboy Ex. 211 at 34 (App. 061).

- That there was zero justification for Mr. Patrick's moves other than enriching himself.  To divorce the charities from more than a quarter billion dollars in assets, Mr. Patrick conspired with an accounting firm named ValueScope to paper the transactions.  May 11, 2026 Hr'g Tr. 123:6–124:13 (App. 093) (noting that ValueScope's March 2025 valuation of the assets was "materially different from others on the basis that the valuation method changed and the level of discount changed"); *see also* Dugaboy Ex. 11 at 3 (App. 019); Dugaboy Ex. 12 at 4 9App. 025).  ValueScope obligingly reversed course in March 2025 from valuations it had provided just a half a year earlier, claiming a cache of assets it said were worth $270 million in September 2024 was now worth just $1.6 million.  *Compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025).  Mr. Patrick happily paid that much and ran off with hundreds of millions.

- That Mr. Patrick from the earliest days of his scheme took steps to conceal his theft.  He instructed his lawyers to create Cayman Islands corporate entities that would be "hard to find or track, or trace.  Or find owners, etc. Generic name.  Strong litigation protection."  Dugaboy Ex. 169 at 1 (App. 042); May 11, 2026 Hr'g Tr. 89:11–17.  This resulted in the birth of an alphabet soup of indecipherable corporate entities, such as CDMCFAD LLC and CDH GP, Ltd.  May 12, 2026 Hr'g Tr. 48:25–49:7; May 11, 2026 Hr'g Tr. 87:9–23 (App. 090).  He deliberately took steps to avoid apprising the charities or anyone else that he was either in the process of stealing or had stolen all Charitable DAF's assets from them.  May 12, 2026 Hr'g Tr. 29:17–24 (App. 106); Dugaboy Ex. 204 at 167 (App. 045), 171–72 (App. 049–050), 179 (App. 057).

14

- That all of this came to a head on March 27, 2025.  On that day, Mr. Patrick and his co-conspirators gave the boot to the four historical charities from the "hard to track or trace" corporate entities they had created, by separating those charities from more than a quarter billion dollars in assets for $1.6 million.  Highland Ex. 63 at  53.  Of course, he did not tell anyone associated with the charities or Mr. Dondero that he had done so. *Id.* at 55.

March 27, 2025, was a momentous day indeed.  The exiting of the traditional charities from beneficial ownership of the Charitable DAF's assets was not just theft of the $270 million dollars that had grown from Mr. Dondero's generous donations of historical assets to the Charitable DAF. *Id.* at 53.  It was also the event that finally stole the Hunter Mountain Investment Trust and its equity position in the Debtor from the Dallas Foundation.  Dugaboy Ex. 242 at 7, 18 (App. 066). In the April 2025 affidavit, Mr. Dondero said there were indications that Hunter Mountain and its residual equity interest in Highland had been sold from its historical structure.  Dugaboy Ex. 36 at 8 (App. 038).  But he expressly stated he did not know to whom it was sold.  *Id.*  Prior to the sale, the equity interest in Highland Capital Management resided in the structure to which Mr. Dondero generously gave it, with the Dallas Foundation to receive and (with the input of Mr. Dondero) to deploy the value of that equity position.

This structure is captured in the following chart, which was admitted into evidence:



Dugaboy Ex. 242 at 12 (App. 065).

Mr. Patrick, as it turns out, sold Hunter Mountain to CLO Holdco LLC, an entity organized under the historical Charitable DAF structure.  May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110). That sale occurred on February 12, 2025, and brought it into the following ownership structure:



Dugaboy Ex. 242 at 18 (App. 066); *see* Dugaboy Ex. 15 at 1 (App. 027).

Had Mr. Patrick stopped with just there, at least the asset would have resided under the ultimate beneficial ownership of the Dallas Foundation and three other established charities, all with structures that enabled Mr. Dondero to provide input into the ultimate good causes the success of the Debtor's equity position was to serve.  But the mortal sin was stealing Hunter Mountain, the equity position in Highland, and the rest of the Charitable DAF assets from those charities in a series of steps, including on March 27, 2025, having been sold into the Charitable DAF structure. And that heist was unknown to Dugaboy or Mr. Dondero at the time of the April 16, 2025 affidavit, its mechanisms and outcomes revealed only later by the work of the Cayman Liquidators.  May 11, 2026 Hr'g Tr. at 76:21–77:23 (App. 083–084) (the documents were not available until appointment as a liquidator because it was "private company information"), 172:23–173:1 (App. 102–103) (Cayman Liquidators' investigation began on May 6, 2025).

16

To the extent the Court in its June 14, 2026, order is determining that, even though Mr. Patrick's massive theft scheme was unknown leading into the Rule 9019 settlement proceedings, Mr. Dondero should have sought Mr. Patrick's removal from his seat at the Hunter Mountain Investment Trust on the basis of the compliance issues detailed in the April 2025 affidavit, that decision would be incorrect. Such arguments would have been met with a louder version of the indecorous guffaws of Highland's appointed managers and their lawyers witnessed in the May 2026 hearings. They would have said that the issues identified in the April 2025 affidavit were minor deviations from best practices at most and had nothing to do with Hunter Mountain itself. That, even if the Hunter Mountain Trust Agreement automatically removes administrators for crimes, or fraud, or breaches of fiduciary duty, there must be some materiality threshold and the lapses ought to have something to do with Hunter Mountain itself. And that, for many of the issues, Mr. Dondero somehow forfeited pursuing remedies for them, because Mr. Dondero learned of them while Mr. Patrick was working for a company associated with Mr. Dondero—Skyview— and tolerated Mr. Patrick retaining his job despite the minor compliance issues. Dugaboy Ex. 36 at 5–6 (App. 035–036).

Of course, Highland's Court-appointed managers could not make any of these arguments with respect to Mr. Patrick's theft of a quarter billion dollars in assets—including the equity stake in Highland—from four established charities. Is it material? Nine figures of thievery counts. Is it germane to Hunter Mountain? Absolutely, the March 27, 2025, fraudulent dispossession of the charities from the Charitable DAF's assets included stealing Hunter Mountain too. Had Mr. Dondero tolerated this theft for too long? Of course not. He pulled the fire alarm with the Court just two days after the Cayman Liquidators released their Statement of Claim, with Dugaboy's motion to stay the judgment. Dkt. 4326 (Dugaboy's July 17, 2025 Motion to Stay 9019 Order).

17

In the end, Mr. Patrick's earlier deviations from the path of righteousness might have been portrayed as simple disputes between Mr. Dondero and Mr. Patrick about how he handled Mr. Dondero's confidential information or other internecine disputes. But his misconduct with respect to the Charitable DAF—which included the Highland equity position when he struck his March 27, 2025, perfidious final blow—meant the following: , By the time Mr. Patrick arrived at the Court for the Rule 9019 hearing on June 25, 2025, he was attempting to deal stolen assets to the Court-appointed managers of Highland. No court of equity should have tolerated that. The newly discovered evidence of Mr. Patrick's theft is grounds for vacatur not only under Rule 60(b)(2), but also Rule 60(b)(6), which is precisely designed to remedy courts unwittingly having descended into the inequitable misconduct of the parties before it. *See Heirs of Guerra v. United States*, 207 F.3d 763, 767 (5th Cir. 2000) (Rule 60(b)(6) relief available to vacate a judgment where "appropriate to accomplish justice" otherwise not available under the judgment). Bankruptcy courts have a responsibility to avoid that, especially when one of the parties is the appointed manager of the Debtor, installed at judicial urging.

In addition, there is absolutely no support for the proposition that a party somehow waives his contractual rights against certain conduct if he does not press remedies against earlier, materially different, and less severe instances of other breaching conduct. That argument has been tried and rejected by court after court after court. *See e.g., Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1152 (5th Cir. 1981) (prior forbearance in seeking remedies does not waive subsequent breach); *Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*, 173 F.Supp.3d 363 (N.D. Tex. 2016) (continued contractual performance does not operate to waive prior breach); *In re J.A.R. Concrete, Inc.*, 673 B.R. 663, 715 n.294 (W.D. Tex. 2025) ("forbearance does not permit reliance" on waiver by breaching party); *In re Endeavour Highrise, L.P.*, 432 B.R. 583, 655-56 (Bankr. S.D. Tex.

18

2010) ("[N]either an innocent party's continuing performance following a breach of contract nor his efforts to induce a breaching party to perform under a defaulted contract constitute a waiver."). Nor does Rule 60(b)(2) supply any analogous principle supporting waiver. It speaks to the presence of "newly discovered evidence." It does not disqualify that newly discovered evidence as grounds for relief simply because evidence of other lesser or unrelated wrongful conduct was already known at the time of the prior judgment.

B.    Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions, Misrepresentations, and Misconduct During Highly Restricted Discovery.

In addition, Mr. Patrick's omissions and misrepresentations are actionable under Rule 60(b)(3) because obstructed discovery into his theft. Rule 60(b)(3) permits relief due to "fraud (whether intrinsic or extrinsic), misrepresentation, or misconduct by and opposing party[.]" Fed. R. Civ. P. 60(b)(3). Such relief is warranted when "the opposing party withheld information called for by discovery or willfully committed perjury." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131,156–57 (5th Cir. 2004).

Here, most notable were Mr. Patrick's obstructive conduct and lies during his June 23, 2025, deposition, just two days before the Rule 9019 hearing, which included:

- His testimony that he could not remember whether one of his new entities—CDMCFAD, LLC—was owned by the four traditional charities. We know now that Mr. Patrick had used this new entity to steal the charitable assets and had put it under the total ownership and control of his sham charity, DFW Charitable. *Compare* Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:22–25 (App. 068) ("Yeah, again, without corporate documents that you can present to me, I – you know – I – I just don't want to be inaccurate" when asked who owned CDMCFAD, LLC) *with* Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 174:8–14 (App. 074) ("I am hundred percent that DFW Charitable Foundation is the ultimate beneficial

owner" of CDMCFAD, LLC).    Of course, Mr. Patrick was not having a memory lapse, as the Court astutely concluded at the June 25, 2025 hearing.  Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 182:4–15 (App. 074) ("I can see what's happening here or I have an impression of what's happening here . . . I feel like you're feigning confusion . . . I need you to speed up your answers and not be confused about things you shouldn't be confused about.").  He orchestrated every detail of this theft, conducting the orchestra of lawyers and agents to steal a quarter billion dollars from established charities.

- His testimony that he could not remember whether he had changed the general partner of The Charitable DAF Fund, L.P. (the Charitable DAF entity directly on top of all the assets). Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:5–9 (App. 068) ("I don't – I don't recall precisely and I, you know, I want – I want to be – when I give you an answer, a hundred percent accurate" when asked about the general partner of The Charitable DAF Fund, L.P.); 13:6–18 (App. 070) ("Yeah, and then this is where my memory is – is – I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer" when asked about the general partner of The Charitable DAF Fund, L.P.).  Of course, his lack of recollection was a lie.  Mr. Patrick had secretly substituted in his own entity as general partner of the DAF structure on March 7, 2024.  Dkt. 4521-1 (Statement of Claim) at 28.

- His testimony that he did not know whether DFW Charitable, the supposed charity Mr. Patrick had set up and run from his home address with almost nonexistent charitable activities, had any ownership in the CDMCFAD entity.  Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 8:1–6  (App. 068) ("Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I – I just don't want to go beyond what I have a hundred percent knowledge of" when asked whether DFW Charitable owned CDMCFAD).  Of

20

course, this too was a lie. After all, just a few weeks earlier, on March 27, 2025, he had thrown the charities out of any beneficial interest in anything and left DFW Charitable alone at the top with all the assets (to the extent he had not paid them to himself in more than $10 million in compensation).

- His misleading answers to questions about who owned Hunter Mountain. He testified that Beacon Mountain was the ultimate owner of Hunter Mountain when in fact multiple entities, including DFW Charitable, sat in the ownership chain above both Hunter Mountain and Beacon Mountain. Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 11:10–19 (App. 069) ("Beacon Mountain LLC" owns Hunter Mountain).

Mr. Patrick's omissions and misrepresentations suffice by themselves to warrant relief under Rule 60(b)(3), because Mr. Patrick is an "opposing party" by virtue of his control over Hunter Mountain, which is an opposing party for purposes of the Rule 9019 settlement proceedings. *See, e.g.*, *Rismed Oncology Systems, Inc. v. Baron*, 297 F.R.D. 637, 656 (N.D. Ala. 2014) (applying Rule 60(b)(3) to fraudulent conduct by party entity's corporate officers who were not named parties). Hunter Mountain is a party in interest in this bankruptcy, and it has been specifically adverse to Dugaboy throughout the Rule 9019 settlement proceedings. Hunter Mountain was one of the two parties to the 9019 Settlement and argued strenuously in favor of its approval, which Dugaboy opposed. And no one disputes that Mr. Patrick controlled Hunter Mountain. Accordingly, Mr. Patrick's fraud is attributable to Hunter Mountain and Rule 60(b)(3) applies.

Furthermore, the discovery misconduct was not limited to Mr. Patrick. Highland's Court-appointed managers—who are unquestionably "opposing parties" under Rule 60(b)(3)—also were eager to throw parties off the scent. Highland was asked for documents pertinent to its review of the propriety of Mr. Patrick acting on behalf of Hunter Mountain. It produced a string of corporate

21

documents, all relating to the historical structure of companies leading to The Dallas Foundation's beneficial interest.  Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 46:8–52:6 (App. 118–124) (questions and answers comparing the list of documents (Dkt. 4277) that he testified at the 9019 proceedings as those he reviewed to establish Mr. Patrick's current authority to act on behalf of the Hunter Mountain Investment Trust to the historical ownership structure of Hunter Mountain and its new structure under the DAF); *see also* Closing Deck, Demonstrative Exhibit 292, at Slides 63–65 (doing same).  If those Highland managers were aware that Mr. Patrick had sold Hunter Mountain and the Debtor equity position into the Charitable DAF and restructured it, they withheld that documentation in discovery and gave misleading testimony when testifying about Mr. Patrick's authority to act.  *See* Dugaboy Ex. 35 at 99:13–20 (Seery testifying that Mr. Patrick had "complete authority over" Hunter Mountain and the associated entities).  During trial for the Rule 60(b) Motion, Mr. Seery testified that he had only reviewed the organizational documents identified in Highland's June 24, 2025, exhibit list for the 9019 Settlement Hearing. *See* Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 47:14–24 (App. 119).  Those documents related to Hunter Mountain as part of the stack of companies as originally formulated by Mr. Dondero in 2011, including Atlas IDF and the Rand PE Fund.  *Id.* at 52:7–11 (App. 124). Yet by that time, Hunter Mountain was no longer within the previous structure, having been sold to the Charitable DAF stack of entities on February 12, 2025.  Mr. Seery agreed that he was aware that Beacon Mountain had sold Hunter Mountain by the consummation of the 9019 Settlement but requested no additional documentation of the Charitable DAF structure to confirm Mr. Patrick's authority to enter into the settlement.  *Id.* at 52:7–10 (App. 124); *but see id.* at 55:17–23 (App. 127).

Even if Mr. Patrick had not omitted or misrepresented his knowledge about the DAF restructuring he had engaged in, the highly truncated discovery process prior to the Rule 9019 Settlement hearing could not have produced the evidence in the later-released Statement of Claim. Discovery lasted all of two weeks from June 10 to June 25, 2025.[2]  Dkt. 4678 at 12.

More importantly, the Cayman evidence would not have popped up in this heavily truncated process.  The theft of the Charitable DAF assets occurred, for the most part, overseas, and obtaining discovery from foreign corporate custodians would have been impossible in the time allotted.  On top of that, the undisputed evidence in the record is that the information that the Cayman Liquidators uncovered was confidential under Cayman law and could only have been unearthed by the Liquidators stepping into the shoes of a Charitable DAF entity and using that authority to request it.  May 11, 2026 Hr'g Tr. at 77:4–19 (App. 084) (Official Liquidator Margot MacInnis testifying that company documents were "private" or otherwise confidential and were only accessible to her because as liquidator she "steps into the shoes of the company").  This is equally true of information in the hands of Cayman government agencies, regarding corporate formation and transactions.  *Id.*  Engagement with a foreign judicial system through the Hague Convention on the Taking of Evidence is a time-consuming and sometimes fruitless endeavor.

C.      **Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable Structures to Avoid Rewarding Mark Patrick's Misconduct.**

At its core, denying the Rule 60(b) motion because Dugaboy should have discovered Mr. Patrick's misconduct sooner rewards only the intentional concealment of the scheme here and is exactly what Mr. Patrick intended.  This Court, particularly as a court of equity, must consider the "need to render a just decision on the basis of all facts." *Banning Co., Inc.*, 6 F.3d at 355.  Were

---

[2] Because of the Court's requirement to produce exhibit and witness lists three days prior to a hearing, effectively discovery lasted only 12 days.

the Court to deny this motion, it would not have considered all the facts and, instead, it would reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

We now know, due to the evidence adduced in the May 2026 hearings before the Court, that Mr. Patrick was dealing away stolen property when he "settled" with Highland's appointed managers and transferred to them a bundle of the rights of Highland's residual equity. If the Court had been fully informed, the Court should not have approved the transfer of this property from the corporate entities to which it was secreted, to Highland's managers, who would claim some level of protection from it being recovered, due to the settlement approval. It would be inconsistent with the Court's role as one of equity and with a charge to do justice.

Whatever the merits of bankruptcy courts taking a light touch when evaluating settlements between the Debtor and third parties,[3] this Court has a special responsibility to make sure managers of a Debtor appointed at the Court's insistence and separating the Debtor from its owners are getting involved with parties who have engaged in misconduct. The Court to grant relief today need not determine that the appointed managers of Highland knew about the misconduct that brought Mr. Patrick to its doorstep. The evidence presented in the motion to vacate now shows that court-appointed managers and the Court should have stayed away from Mr. Patrick, a man that should have been acting in the best interests of four established charities and came to the Court through misconduct and fraud, acting only for himself.

The Denial Order points out that vacatur of the 9019 Settlement Approval Order would not undo Mark Patrick's misconduct as a reason why Rule 60(b)(6) relief is inappropriate. Denial

---

[3] And this touch is not as light as some have claimed, as bankruptcy courts ought not and do not approve settlements when one of the parties or the settlement arrives at the court through fraud, collusion, or bad faith conduct. *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).

24

Order at 13–14. That misses the point. Dugaboy does not seek to unwind the restructuring—at least before this Court—but seeks to vacate the 9019 Settlement. This Court, as a court of equity, should not reward Mr. Patrick with approval of a highly favorable settlement agreement gained as a result of his illusory control, control he was automatically divested of when he absconded with the charitable entities' assets for his own benefit. Mr. Patrick's statement that he would retain control even if the DAF restructuring were rescinded is false, as effectuating a complex scheme to steal from the DAF would constitute cause to automatically remove Mr. Patrick as administrator. *See* Dugaboy Ex. 1 at 1 (App. 002). His further assertion that he would (or even could) reappoint himself as administrator should he be removed for fraud or theft from the DAF shocks the conscience and offends this Court's equitable powers to assist such misconduct by blessing the 9019 Settlement Agreement. May 12, 2026 Hr'g Tr. at 103:3–6.

## V.       CONCLUSION

Rule 59(e) exists to permit a court to correct factual mistakes before appellate review becomes necessary. The Denial Order rests upon one such mistake. It treats evidence first disclosed after the Rule 9019 hearing as though Dugaboy possessed it before that hearing. The record establishes otherwise. Because the Court's Rule 60(b)(2) analysis depends upon that erroneous factual premise, reconsideration is warranted. It should also be granted under Rules 60(b)(3) and 60(b)(6) for the reasons discussed above. Denying this motion would only reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

Date: June 29, 2026

By: */s/ Michael J. Edney*
Michael J. Edney
Martha Stolley
Avery Joseph Welker
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue NW

25

Washington, DC 20004
Michael.edney@morganlewis.com
Martha.stolley@morganlewis.com
Avery.welker@morganlewis.com
T: 202-739-3000
F: 202-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

***Counsel for The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 29, 2026, a true and correct copy of this

document was served electronically via the Court's CM/ECF system to the parties registered or

otherwise entitled to receive electronic notices in this case.

<u>/s/ Michael J. Edney</u>
Michael J. Edney

Michael J. Edney
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054-sgj |
| Debtor. | |

**THE DUGABOY INVESTMENT TRUST'S INDEX IN SUPPORT OF MOTION FOR
RECONSIDERATION FROM ORDER DENYING MOTION FOR RELIEF FROM
ORDER AND MOTION TO VACATE**

The following exhibits are submitted in support of the Dugaboy Investment Trust's Motion for
Reconsideration from Order Denying Motion for Relief from Order and Motion to Vacate:

| Description | Page No. |
|---|---|
| Dugaboy Ex 001 - 2015-12-17 HMIT Trust Agreement | App. 001 |
| Dugaboy Ex 007 - 2025-07-15 Shields Work Plan | App. 005 |
| Dugaboy Ex 011 - 2024-09-30 Valuation Analysis of 100 Participation Shares of DAF HoldCo, Ltd. | App. 015 |

1

| Description | Page No. |
|---|---|
| Dugaboy Ex 012 - 2025-03-25 Valuation Analysis of Certain Participation Shares of DAF HoldCo, Ltd. | App. 020 |
| Dugaboy Ex 015 - 2025-02-12 Membership Interest Purchase Agreement | App. 026 |
| Dugaboy Ex 036 - 2025-04-09 Dondero Affidavit | App. 030 |
| Dugaboy Ex 169 - 2024-02-05 Email-Shields Legal Group_Mark Patrick | App. 041 |
| Dugaboy Ex 204 - 2025-07-01 Texas Business Court Petition | App. 043 |
| Dugaboy Ex 211 - 2025-08-19 Aff & Exh Index-MacInnis | App. 059 |
| Dugaboy Ex 242 - 2024-03-06 DAF-Rand Structure Chart | App. 063 |
| June 23, 2025 Transcript – Highland Ex. 58 | App. 067 |
| June 25, 2025 Transcript – Dugaboy Ex. 35 | App. 072 |
| May 11, 2026 Transcript | App. 077 |
| May 12, 2026 Transcript | App. 105 |
| May 21, 2026 Transcript | App. 116 |

# EXHIBIT 1

## TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1.  Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

HCM-D10000002

App. 002

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2. Scope. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising. Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3. Name; Certificate of Trust. The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided. The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4. Account Establishment. The Administrator shall establish and control the Account. The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5. Beneficial Owner; Liability of Beneficial Owner. The beneficial owner of the trust shall be Beacon Mountain LLC. Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6. Title to Trust Property. Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

2

HCM-D10000003

App. 003

7.    Purpose and Powers of the Trust; Administrator's Powers.   The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement.   The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust.   The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement.   The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8.    Fiduciary Duties of Administrator.   (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b)    The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust.   For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c)    To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d)    Unless otherwise expressly provided herein:

(i)    whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii)    whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

3

HCM-D10000004

App. 004

# EXHIBIT 7

Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

# IN THE GRAND COURT OF THE CAYMAN ISLANDS

# FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 (    )

## IN THE MATTER OF THE GRAND COURT ACT

## BETWEEN:

### CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

## AND

| | |
|---|---|
| (1) | **MARK ERIC PATRICK** |
| (2) | **PAUL MURPHY** |
| (3) | **CDMCFAD, LLC** |
| (4) | **DFW CHARITABLE FOUNDATION** |
| (5) | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| (6) | **CLO HOLDCO, LTD.** |

Defendants

---

### EXHIBIT MM-1

---

This is the Exhibit shown to me and marked "**MM-1**" to the First Affidavit of **MARGOT MACINNIS**.

Sworn before me this *15TH* day of July 2025

_____

Notary Public

Rachel Baxendale
Notary Public - Cayman Islands

_____
Commission expires on 31 January *2026*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001)

**App. 006**

## INDEX TO EXHIBIT MM-1
## TO FIRST AFFIDAVIT OF MARGOT MACINNIS

| NO. | DESCRIPTION | DATE | PAGES |
|-----|-------------|------|-------|
| 1. | Company's Memorandum and Articles | 20 February 2025 | 1-37 |
| 2. | Highland Kansas Foundation – Certificate of Incorporation | 23 November 2021 | 38-40 |
| 3. | Highland Kansas Foundation – By-laws | Undated | 41-59 |
| 4. | Highland Dallas Foundation – Certificate of Incorporation | 23 November 2021 | 60-62 |
| 5. | Highland Dallas Foundation – By-laws | Undated | 63-77 |
| 6. | Highland Santa Barbara Foundation – Certificate of Incorporation | 23 November 2021 | 78-80 |
| 7. | Highland Santa Barbara Foundation – By-laws | Undated | 81-95 |
| 8. | Procedures for Establishment and Operation of Funds and Supporting Organizations | Undated | 96-122 |
| 9. | Highland Dallas Foundation – IRS Determination Letter | 19 January 2013 | 123-124 |
| 10. | Highland Santa Barbara Foundation - IRS Determination Letter | 12 February 2013 | 125-127 |
| 11. | Highland Kansas Foundation - IRS Determination Letter | 21 March 2013 | 128-129 |
| 12. | Highland Kansas City Foundation - Legal Relationship Agreement | 30 November 2011 | 130-132 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 13. | Highland Dallas Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 133-140 |
| 14. | Highland Santa Barbara Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 141-147 |
| 15. | Charitable DAF Fund, LP - LPA | 11 March 2024 | 148-165 |
| 16. | CLO HoldCo - Expense report of as of 30 June 2024 | 30 June 2024 | 166-169 |
| 17. | Letter from Stinson LLP to the JOLs | 8 May 2025 | 170-173 |
| 18. | NexPoint Capital, Inc. – Proxy Statement | 7 May 2025 | 174-196 |
| 19. | NexPoint Real Estate Strategies Fund – Prospectus | 30 April 2025 | 197-333 |
| 20. | Complaint - Liberty CLO HoldCo, Ltd v Nancy Dondero and others (United States District Court for the State of Delaware) | 28 February 2025 | 334-345 |
| 21. | CDHC Royse City Land, LLC – Property Tax Assessments | Various | 346-356 |
| 22. | CDHC Assets, LLC - Property Tax Assessments | May 2025 | 357-368 |
| 23. | CDHC Fort Worth Land, LLC - Property Tax Assessments | Various | 369-378 |
| 24. | CDHC Stewart Creek, LLC – Property Tax Assessment | 29 May 2025 | 379 |
| 25. | Rand Advisors LLC – Form ADV | March 2025 | 380-408 |
| 26. | Rand Advisors LLC – Brochure | March 2025 | 409-434 |
| 27. | DFW Charitable Foundation – Certificate of Incorporation | 9 December 2024 | 435-437 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 28. | Email from Shields Legal to Mr Patrick | 5 February 2024 | 438 |
| 29. | Structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions | Undated | 439 |
| 30. | Structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions | Undated | 440 |
| 31. | No Confidence Letter | 11 November 2024 | 441-442 |
| 32. | Email from Mr Murphy to Mr Patrick | 26 November 2024 | 443-447 |
| 33. | Email from Walkers to the Directors | 27 November 2024 | 448-453 |
| 34. | 18 December Resolution | 18 December 2024 | 454-460 |
| 35. | CDM Assignment | 18 December 2024 | 461-466 |
| 36. | CDMCFAD, LLC LLC Agreement | 18 December 2024 | 467-494 |
| 37. | Walkers' Draft Advice | February 2025 | 495-499 |
| 38. | Share Issuance Resolution | 7 February 2025 | 500-524 |
| 39. | Carrington Coleman Email | 18 December 2024 | 525-526 |
| 40. | Letter Agreement | 27 March 2025 | 527-531 |
| 41. | Manager Consent (Admission and Redemption Documents exhibited) | 27 March 2025 | 532-688 |
| 42. | Resolution of the Directors (Redemption) | 2 April 2025 | 689-691 |
| 43. | Resolution of the Directors (Assignment) | 2 April 2025 | 692-693 |
| 44. | Expenses Table | Undated | 694 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 45. | Resolution of the Directors (Mr Patrick's Salary) | 13 September 2024 | 695-696 |
| 46. | Resolution of the Directors (Mr Patrick's LTI Payment and Annual Discretionary Bonus) | 1 October 2024 | 697-704 |
| 47. | Employment Agreement | 24 March 2021 | 705-722 |
| 48. | Santa Barbara Foundation - Audited Financial Statements (year ended 31 December 2023) | 5 September 2024 | 723-750 |
| 49. | Valuescope Report | 11 April 2024 | 751-809 |
| 50. | Valuescope Report | 7 January 2025 | 810-864 |
| 51. | Valuescope Report | 26 March 2025 | 865-939 |
| 52. | Carrington Coleman Memo | 25 March 2025 | 940-956 |
| 53. | IRS Complaint | 20 March 2025 | 957-973 |
| 54. | FTI Report | 27 March 2025 | 974-987 |
| 55. | Mercer Report | 26 August 2024 | 988-1007 |
| 56. | H&B Memorandum | 9 July 2021 | 1008-1012 |
| 57. | Opinion (Mr Tony Beswetherick KC) | 5 March 2025 | 1013-1038 |
| 58. | Email from PwC to Walkers | 11 February 2025 | 1039-1057 |
| 59. | Email from Mr Patrick to Walkers | 17 March 2025 | 1058-1074 |
| 60. | Email chain between FTI and Walkers | 26 March 2025 | 1075-1092 |
| 61. | Letter from Campbells to the JOLs | 16 May 2025 | 1093-1095 |
| 62. | Letter from Johnstone Law to Campbells | 30 May 2025 | 1096-1097 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 63. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 30 May 2025 | 1098-1112 |
| 64. | Letter from Johnstone Law to Campbells | 5 June 2025 | 1113-1116 |
| 65. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 9 June 2025 | 1117-1124 |
| 66. | Letter from Maples to Campbells (enclosing draft protocol) | 19 June 2025 | 1125-1136 |
| 67. | Letter from Campbells to Maples (enclosing Revised Campbells Draft Protocol) | 29 June 2025 | 1137-1170 |
| 68. | Email from Kobre & Kim to Maples | 30 June 2025 | 1171-1173 |
| 69. | Email from Baker & Partners to Maples | 30 June 2025 | 1174-1176 |
| 70. | Texas Petition | 1 July 2025 | 1177-1422 |
| 71. | Texas Petition – Proposed Order | Undated | 1423-1426 |
| 72. | Second Rule 11 Agreement | 11 July 2025 | 1427-1429 |
| 73. | DFW Charitable Foundation – Delaware Division of Corporations Search Results | Undated | 1430 |
| 74. | CDMCFAD, LLC – Delaware Division of Corporations Search Results | Undated | 1431 |
| 75. | Company's Certificate of Incorporation | 27 October 2011 | 1432 |
| 76. | Shields Legal – Memorandum – Work Plan | 9 November 2023 | 1433-1440 |
| 77. | Letter from Seyfarth Shaw LLP to the IRS | 1 May 2025 | 1441-1446 |

<span style="color:red">App. 011</span>

# MEMORANDUM – WORK PLAN[1]

RE:   Work Plan, Scope of Work, and Deliverables

DATE:   November 9, 2023

---

   This Memorandum is intended to be informational and provide guidance. It sets forth the work plan, scope of work, and requested deliverables for your review of matters relating to the following entities (highlighted in red). We would like your review to focus on the entities highlighted. As a general overview, we are looking for memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc., as further outlined below and to be flagged as part of your review.



## I.  LEGAL RESEARCH/ POTENTIAL LITIGATION ISSUES[2]

  a. <u>Transfer of 100% of Management Shares in Charitable DAF Holdco, Ltd., and 100% ownership interest in Charitable DAF GP, LLC, by Grant Scott to Mark Patrick.</u>

---

[1] This Memorandum is attorney worked product, privileged, and confidential. Neither it nor its contents may be shared in any manner without express written permission from Shields Legal Group, P.C.

[2] The client will require a written agreement detailing the scope of work (this may be used as an attachment or reference) and hourly rates.

**1433**

**App. 012**

1. Confirm each of these transfers is valid and enforceable under Cayman law?

2. Is consideration a requirement under Cayman law?

3. If so, did each transfer have consideration under Cayman law?

4. Note: we understand there was no monetary consideration for each transfer, but there were tax considerations for this transfer including potential future tax liability.  Donor also implicitly consented to the transfer of the voting shares by not objecting since the transfer.

5. Analyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.?

6. Analyze whether Donor has legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.

ii.   **Priority: high[3].**

iii.   **Work product: legal opinion[4] and/or memorandum.**

1.   **Note: we may need to rely on opinions and memoranda in potential future disputes.**

iv.   **Anticipated attorney hours to completion: 30.**

b.   Who would have standing under Cayman law for alleged corporate malfeasance or assert lack of corporate control from the transfers? Specifically, we want to understand third parties' abilities (in addition to regulators' abilities).

---

[3] Guides for priority:
-High: response requested within two weeks;
-Medium: response requested within four weeks; and
-Low: response requested within six weeks.
[4] Legal opinions and memorandums should include citations to and copies of relevant and applicable authorities.

App. 013

      i. **Priority: high.**

      ii. **Work product: legal opinion and/or memorandum.**

      iii. **Anticipated attorney hours to completion: 10.**

c. <u>What are defenses under Cayman law – estoppel, waiver, statute of limitations, consent, others?</u>

      i. **Priority: high.**

      ii. **Work product: legal opinion and/or memorandum.**

      iii. **Anticipated attorney hours to completion: 10.**

d. <u>Is there a corporate alter ego concept under Cayman law, and if so, what are defenses to it?</u>

      i. **Priority: high.**

      ii. **Work product: memorandum.**

      iii. **Anticipated attorney hours to completion: 10.**

II. **CORPORATE REVIEW**.

a. <u>Top-down review of each entity with respect to corporate structure, management, ownership, capitalization, and voting</u>.

      i. **Priority: medium.**

      ii. **Work product: memorandum.**

      iii. **Anticipated attorney hours to completion: 30.**

b. <u>Written confirmation that the DAF is not a "regulated entity" under Cayman law and not subject to those compliance requirements. To reiterate, the DAF is not a "Fund" in the traditional sense: (i) there is no PPM and (ii) there are no subscribers/investors</u>.

      i. **Priority: medium.**

      ii. **Work product: memorandum.**

      iii. **Anticipated attorney hours to completion: 5.**

**1435**
**App. 014**

# EXHIBIT 11

**VALUATION ANALYSIS OF**
**100 PARTICIPATION SHARES OF**
**CHARITABLE DAF HOLDCO, LTD**

**AS OF**
**SEPTEMBER 30, 2024**

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd



**App. 016**



January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

**RE: *Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date").  ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes.  No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value.  Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60.  These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

[1]   The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

**App. 017**

Mr. Mark Patrick
January 7, 2025
Page 2

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.

8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2]  The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry.  We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd

- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information, as well as on other data we developed.

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**VALUE**SCOPE, Inc.

Mr. Mark Patrick
January 7, 2025
Page 3

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis.  Our fee for these valuation services was in no way influenced by the results of our analysis.  The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report.  If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope, Inc.*

ValueScope, Inc.

# EXHIBIT 12

App. 020

**VALUATION ANALYSIS OF
CERTAIN PARTICIPATION SHARES OF
CHARITABLE DAF HOLDCO, LTD**

**AS OF
MARCH 25, 2025**

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group



PM-1/300

**App. 021**



March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

**RE: *Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value.  Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60.  These factors include:

1. The nature of the business and its history from inception.

---

[1]    Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

950 E. State Highway 114 • Suite 120 • Southlake • Texas 76092 • Tel: 817.481.4901 • Fax:  817.481.4905
www.valuescopeinc.com

PM-1/301

**App. 022**

Mr. Bart F. Higgins
March 26, 2025
Page 2

2.  The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3.  The book value and the financial condition of the business.
4.  The earning capacity of the business.
5.  The dividend-paying capacity of the business.
6.  Whether the enterprise had goodwill or other intangible value.
7.  The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8.  The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2]  The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry.  We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

[2]  The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

Mr. Bart F. Higgins
March 26, 2025
Page 3

- Information regarding the Company's history and current operations

- Historical distributions paid to the holders of the Subject Interest

- The organizational structure chart for Charitable DAF HoldCo, Ltd

- Discussions with the Company's Management

- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024

- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date

- An interview with Management regarding expectations for future distributions

- An application of appropriate valuation techniques and procedures, including the income approach

- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information, as well as on other data we developed.

**VALUE**SCOPE, LLC

PM-1/303

**App. 024**

Mr. Bart F. Higgins
March 26, 2025
Page 4

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope*

ValueScope, LLC

**VALUE**SCOPE, LLC

PM-1/304

**App. 025**

# EXHIBIT 15

App. 026

Execution Version

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as of February 12, 2025, is entered into between RAND PE FUND I, L.P., a Delaware limited partnership ("**Seller**") and CLO HOLDCO, LLC, a Delaware limited liability company ("**Buyer**").

### RECITALS

(A) WHEREAS, Seller owns all of the issued and outstanding membership interests (the "**Membership Interests**"), of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**"); and

(B) WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Membership Interests, subject to the terms and conditions set forth herein.

(C) NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### PURCHASE AND SALE

**Section 1.01    Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to the Membership Interests, free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance ("**Encumbrance**"), for the consideration specified in Section 1.02.

**Section 1.02    Purchase Price.** The aggregate purchase price for the Membership Interests shall be $1,000,000.00 (the "**Purchase Price**"). The Buyer shall pay the Purchase Price to Seller at the Closing (as defined herein) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Schedule 1.02 hereto.

**Section 1.03    Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at noon on the Closing Date.

**Section 1.04    Transfer Taxes.** Buyer shall pay, and shall reimburse Seller for, any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees, or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement.

**Section 1.05    Withholding Taxes.** Buyer shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable law. Buyer shall provide Seller with written notice of its

HCM-D10000021

**App. 027**

intent to withhold prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. dTo the extent that amounts are so withheld and paid over to the appropriate tax authority by the Buyer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

**Section 1.06   Allocation of Company Income and Loss.** Buyer and Seller shall request that the Company allocate all items of Company income, gain, loss, deduction, or credit attributable to the Membership Interests for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE II are true and correct as of the date hereof. For purposes of this Article II, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual knowledge of those persons listed on Schedule 2 of the Schedules.

**Section 2.01   Organization and Authority of Seller; Enforceability.** Seller is a limited partnership duly organized, validly existing and in good standing under the laws of the state of Delaware. Seller has full limited partnership power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited partnership action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution, and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 2.02   No Conflicts; Consents.** The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of limited partnership, limited partnership agreement, or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Seller, except where the violation or conflict would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party, except where the conflict, violation, default, termination, cancellation, modification, or acceleration would not, individually or in the aggregate, have a

2

HCM-D10000022

**App. 028**

material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (d) result in any violation, conflict with or constitute a default under the Company's organizational documents (the "**Beacon Organizational Documents**"); or (e) result in the creation or imposition of any Encumbrance on the Membership Interests. No consent, approval, waiver, or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby, except such consents, approvals, waivers, or authorizations which would not, in the aggregate, have a material adverse effect on the Seller's ability to consummate the transactions contemplated hereby on a timely basis.

Section 2.03    **Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Membership Interests; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, except any Actions that would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

Section 2.04    **Financial Statements.** True, correct, and complete copies of any financial statements requested by the Buyer (collectively, the "**Financial Statements**") have been provided to Buyer. To Seller's Knowledge, the Financial Statements, if any, are true, correct, and complete.

Section 2.05    **Ownership of Membership Interests.**

(a)    Seller is the sole legal, beneficial, record, and equitable owner of the Membership Interests, free and clear of all Encumbrances whatsoever.

(b)    To Seller's Knowledge, the Membership Interests were issued in compliance with applicable laws. To Seller's Knowledge, the Membership Interests were not issued in violation of the organizational documents of the Company or any other agreement, arrangement, or commitment to which Seller or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any Person.

(c)    Other than the organizational documents of the Company, there are no voting trusts, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

Section 2.06    **Beacon Organizational Documents.** The Seller has provided Buyer a true, correct, and complete copy (including all amendments and modifications) of the Beacon Organizational Documents, which agreement is in full force and effect and is the only agreement in effect with respect to the matters described therein.

Section 2.07    **Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

HCM-D10000023

**App. 029**

# EXHIBIT 36

App. 030

Case 19-34054-sgj11  Doc 4684-1  Filed 06/29/26  Entered 06/29/26 23:26:09  Desc
Case 3:22-cv-00203-S  Document 51  Appendix  Filed 07/28/26  Page 69 of 167  PageID 835

Case 19-34054-sgj11  Doc 4534-7  Filed 04/01/26  Entered 04/01/26 19:16:22  Desc
Exhibit 7  Page 2 of 11

Digitally signed by Advance Performance Exponents Inc
Date: 2025.04.16 20:39:55 -05:00
Reason: Apex Certified
Location: Apex

**FSD2025-0099**  **Page 1 of 10**  **2025-04-16**



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

FSD NO.    OF 2025 (   )

IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP

---

### AFFIDAVIT OF JAMES DAVID DONDERO

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1. I am the President of NexPoint Advisors, L.P. (*NexPoint*), an investment advisor registered with the U.S. Securities and Exchange Commission (*SEC*). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this affidavit in support of the petition (the **Petition**) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the **LP**) and the Charitable DAF Fund, LP (the **Fund**) pursuant to section 92(e) of the Companies Act (2025 Revision) (the **Act**) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the **CWR**).

3. I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

**App. 031**

FSD2025-0099 **Page 2 of 10** 2025-04-16

## BACKGROUND

5. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6. I was formerly the President of Highland Capital Management, L.P. (*Highland*), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (*2015 Transaction*). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (*Highland Bankruptcy*) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7. In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (*Skyview*) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

## THE FUND

8. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the *Supporting Organizations*) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the *Charities*).

10. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (*ARLPA*), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (*Articles*), govern the Fund and its partners.

11. The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the *GP*), a Delaware company incorporated on 25 October 2011.

**App. 032**

FSD2025-0099    **Page 3 of 10**    2025-04-16

12. In addition to the Participation Shares, the LP issued 100 management shares (the **Management Shares**) with the only voting rights for any and all shareholders in the LP.  In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the **Control Position**).

13. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person.  However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland.  He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17. Mark Patrick was hired as Tax Counsel at Highland in 2008.  His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates.  In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18. In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

FSD2025-0099    3    2025-04-16

**App. 033**

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/08/26   Page 72 of 167   PageID 838

Case 19-34054-sgj11   Doc 4534-7   Filed 04/01/26   Entered 04/01/26 19:16:22   Desc
Exhibit 7   Page 5 of 11

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

**App. 034**

**Page 5 of 10**

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26. Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29. Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30. Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations

5

App. 035

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Appendix   Filed 07/08/26   Page 74 of 167   PageID 840

Case 19-34054-sgj11   Doc 4534-7   Filed 04/01/26   Entered 04/01/26 19:16:22   Desc
Exhibit 7   Page 7 of 11

FSD2025-0099 **Page 6 of 10** 2025-04-16

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the *Expense Summary*) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

    (a) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

    (b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32. The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33. In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (*MNPI*) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (*Compliance Policy*). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34. I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (*Dallas Foundation*), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

FSD2025-0099 2025-04-16

App. 036

**FSD2025-0099** **Page 7 of 10** **2025-04-16**

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36. On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37. On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38. After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

**FSD2025-0099** **2025-04-16**

**App. 037**

FSD2025-0099                    **Page 8 of 10**                    2025-04-16

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39.   After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40.    Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41.   On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42.   On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

FSD2025-0099                                                      2025-04-16

**App. 038**

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43.    I have become aware that, on 14 March 2025, the Texas Attorney General (*Texas AG*) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44.    I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45.    I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46.    Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47.    As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48.    The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

**App. 039**

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Appendix   Filed 07/28/26   Page 742 of 831   Page 78 of 167   PageID 844

Case 19-34054-sgj11   Doc 4534-7   Filed 04/01/26   Entered 04/01/26 19:16:22   Desc
Exhibit 7   Page 11 of 11

**FSD2025-0099**          **Page 10 of 10**          2025-04-16

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

SWORN by the above named          )
**JAMES DAVID DONDERO**          )
This 9th day of April 2025          )
at 4:46 pm          )

_____
**JAMES DAVID DONDERO**

**BEFORE ME:**

_____
**NOTARY PUBLIC**

KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025

THIS AFFIDAVIT was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (Ref:AJ/RZ/0016)

**App. 040**

EXHIBIT 169

App. 041

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 05 February 2024 1:20 PM |
| **To:** | Philip Aubry |
| **Cc:** | Geoffrey Sykes; Bart Higgins |
| **Subject:** | FW: Cayman GP |
| **Attachments:** | image001.png |

[this message is from an external sender]

FYI

 **BRANDON R. SCHALLER**
**Attorney**
16400 Dallas Parkway, Suite 300
Dallas, Texas 75248
Direct: (469) 726-3055
Email: bschaller@shieldslegal.com

**Legal Solutions. Business Insight. Your Trusted Advisor.**

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Monday, February 5, 2024 12:18 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Shawn Raver <sraver@hotmail.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Re: Cayman GP

CAUTION: This email originated from outside of the organization.

Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.

On Mon, Feb 5, 2024, 11:43 AM Brandon R. Schaller <bschaller@shieldslegal.com> wrote:

> Mark,
>
> Question from Walkers. Do you want the new Cayman GP to be a Cayman LLC or an exempted company?

1

CONFIDENTIAL

**438**
**TDIT003704**

**App. 042**

# EXHIBIT 204

App. 043

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

3
Appendix Page 166

CONFIDENTIAL

1342
TDIT004608

App. 044

**Michael Stockham, JD, CFE, CCEP** | **Holland &**
**Knight**

Partner

Holland & Knight LLP

One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas,
Texas 75201

Phone 214.969.2515 | Fax 214.969.1751 | Mobile
214.542.6435

michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified*
*Fraud Examiners www.acfe.com*
 *CCEP - Certified Compliance and Ethics Professional -*
*Society of Corporate Compliance and Ethics*
*Professionals www.corporatecompliance.org*

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515)
<Michael.Stockham@hklaw.com>; Julie Diaz
<jdiaz@dallasfoundation.org>;
mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson
<wilkerson@growyourgiving.org>; Jackie Carrera
<jcarrera@sbfoundation.org>; Rosenberg, David M
(DAL - X61508) <David.Rosenberg@hklaw.com>;
DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Mike,
We remain open to finding a framework within
which we can resolve your clients' concerns.
I don't want to repeat points already made in my
email dated 30th January 2025, but our
understanding was that we were to prepare a
presentation for the Foundations to address
these concerns. This was a course of action
suggested by you in our call last year and one
which we thought was very sensible.
We are struggling to understand what happened
between 21st January (when David Rosenburg,
from your firm, confirmed a video conference
would be acceptable) and 23rd January when an
email was sent to Mark's old email address
repeating various allegations that we were going
to address in the presentation.

CONFIDENTIAL

**1343**
TDIT004609

**App. 045**

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you

5
Appendix Page 168

CONFIDENTIAL

**1344**
TDIT004610

**App. 046**

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

CONFIDENTIAL

**1345**
TDIT004611

**App. 047**

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP | Holland & Knight**

Partner

Holland & Knight LLP

One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201

Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435

michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

7

CONFIDENTIAL

1346
TDIT004612

**App. 048**

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

**CONFIDENTIAL**

**1347**
TDIT004613

**App. 049**

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

> The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

CONFIDENTIAL

**1348**
TDIT004614

**App. 050**

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman  KY1-1007
Cayman Islands
Phone: +1 345 946 3459
Mobile: +1 345 324 1121
Fax: +1 345 946 3493
E-mail : paul@gkmanagement.com.ky

CONFIDENTIAL

**1349**
TDIT004615

**App. 051**

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

CONFIDENTIAL

**1350**
TDIT004616

**App. 052**

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo.  We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses

- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.

- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.

- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations.  We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make

CONFIDENTIAL

**1351**
TDIT004617
**App. 053**

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.



**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything

13
Appendix Page 176

CONFIDENTIAL

**1352**
TDIT004618

**App. 054**

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg> <~WRD0000.jpg> <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.

CONFIDENTIAL

**1353**
TDIT004619

**App. 055**



EXHIBIT
4-C

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

　　　Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

　　　　　　　　　Sincerely yours,

　　　　　　　　　Michael W. Stockham

cc:　　David Rosenberg

**1354**

CONFIDENTIAL

TDIT004620

**App. 056**

**Rhiannon Zanetic**

---

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 18 March 2025 09:27 |
| **To:** | Mancino, Douglas; Michael.Stockham@hklaw.com |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this. |

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.

- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.

- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

---

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

---

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

CONFIDENTIAL

**1355**
TDIT004621

**App. 057**

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 03 April 2025 09:51 |
| **To:** | Mancino, Douglas |
| **Cc:** | Michael.Stockham@hklaw.com; Paul Murphy |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, no such call is on our calendar, so I am not sure of the source of the confusion.  We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back.  Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas  Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

CONFIDENTIAL

**1356**
TDIT004622
**App. 058**

# EXHIBIT 211

App. 059

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/28/26   Page 98 of 167   PageID 864
Appendix   Page 762 of 831

**29**

(a)   Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192;

(b)   Redemption and Amendment No.2 Agreement under which CDM redeemed the Company's CDM Membership for the same sum of US$1,637,192 (the "**Redemption Amount**"); and

(c)   A written consent of the manager of CDM in connection with the matters referred to at paragraphs 46.1(a) and 46.1(b) above (the "**Manager Consent**").

46.3   Copies of the Letter Agreement, the Manager Consent and the Admissions and Redemption Documents (which are Exhibits A and B of the Manager Consent) are exhibited at pages 527 to 688 of MM-1.

47   On 2 April 2025, the Directors of the Company resolved to approve the:

47.1   redemption of the Company's CDM Membership for the Redemption Amount; and

47.2   shareholder distribution of US$1,612,192.01 to the Community Foundation of North Texas and the Supporting Organisations.

Copies of the resolutions are exhibited at pages 689 to 691 of MM-1.

48   The effect of the Redemption was that the Company's CDM Membership were in effect purchased by or transferred to DFW for the Redemption Amount.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     26

CONFIDENTIAL                                          TDIT004992

**App. 060**

The Remuneration Transactions

49   The Company's expenses have increased materially following Mr Patrick's appointment as a director on 25 March 2021. Specifically (and amongst other things):

49.1   The Directors' fees increased from around US$40,000 in 2022 to approximately US$600,000 in 2023 (page 694 of MM-1).

49.2   On 13 September 2024, the Directors resolved to increase Mr Patrick's salary to US$850,000 per annum and approve a long-term incentive ("**LTI**") of 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return).  A copy of this resolution is exhibited at pages 695 to 696 of MM-1.

49.3   On 1 October 2024:

(a)   the Directors resolved that Mr Patrick was to receive an LTI payment of US$975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.  A copy of this resolution is exhibited at pages 697 to 704 of MM-1.

(b)   Mr Patrick signed an employment agreement for his own position at the Company for the period from 24 March 2021 which provided, among other things, for a base salary of US$850,000 and an LTI payment of US$4,759,000. A copy of this agreement is exhibited at pages 705 to 722 of MM-1.

50   By way of contrast to the remuneration that Mr Patrick resolved that he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately US$60,000 per annum.

51   As regards expenses, expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     27

**CONFIDENTIAL**                                                   **TDIT004993**

Case 19-34054-sgj11 Doc 4684-1 Filed 06/29/26 Entered 06/29/26 23:26:09 Desc
Case 3:22-cv-00203-S Appendix Filed 07/03/26 Page 100 of 167 PageID 866

31

Page 35 of 1530

**THE JOLS' CONCERNS**

52    The JOLs' overarching concern is that the Relevant Transactions and the Remuneration Transactions were pursued by the Directors for the sole or primary reason of removing assets from the Company to benefit entities controlled by Mr Patrick or for his benefit personally, to the detriment of the Charities.

Impacts on Charities

53    The JOLs continue to investigate the impact that the Relevant Transactions have on the Charities. The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives by: (i) stripping them of some of their assets and creating a hole in their balance sheets; (ii) reducing the Charities' ability to pay their overheads because, historically, these have been (in part) financed by the Supporting Organisations, where the fees charged by the Charities are typically based on a percentage of the market value of assets controlled by the Supporting Organisations; and (iii) the Remuneration Transactions have reduced the Fund's ability to provide financial support to the Supporting Organisations and, by extension, the Charities.

*A Hole in the Charities' Balance Sheets*

54    Although the JOLs' investigations continue, they understand that, historically, the Supporting Organisations have held the Participating Shares on their own balance sheets and the Charities have held them on their consolidated balance sheets.

55    For example, the Santa Barbara Foundation:

55.1    Its publicly available, independently audited financial statements for the year ended 31 December 2023 (a copy of which are exhibited at pages 726 to 750 of MM-1) disclose the following:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    28

CONFIDENTIAL TDIT004994

App. 062

# EXHIBIT 242

App. 063

**DAF Structure Chart**

*(as of 3/6/2024)*



**App. 064**



**Rand Structure Chart**
*(effective as of 12/2015 – 8/2022)*

App. 065

**DAF/Rand Structure Chart**
*(May 2025)*



**App. 066**

MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
1–4

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

§

In re                              § Chapter 11

HIGHLAND CAPITAL MANAGEMENT, L.P,  § Case No. 19-34054-sgj11

Reorganized Debtor.                §

                                   §

------------------------------------------------

ORAL DEPOSITION OF

MARK PATRICK

JUNE 23, 2025

(Reported remotely)

------------------------------------------------

ORAL DEPOSITION OF MARK PATRICK, produced as a witness duly sworn by me at the instance of the Defendant, taken in the above-styled and numbered cause on the 23RD day of June, 2025, from 12:05 p.m. to 1:14 p.m., via Zoom videoconference before Ida Alcala, Certified Shorthand Reporter No. 12565, in and for the State of Texas, reported by oral stenographic means, pursuant to the Texas Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

## Page 2

APPEARANCES

Mr. Sawnie A. Mcentire     (Via Videoconference)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Ave Ste 4400
Dallas, Texas 75201-7324
214-237-4300

Mr. Michael Lang          (Videoconference)
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave Ste 2390
Dallas, Texas 75201
214-817-4500

Mr. Louis M. Phillips     (Via Videoconference)
KELLY HART ATTORNEYS AT LAW (LOUISIANA)
Baton Rouge Office
301 N. Main Street Ste. 1600
Baton Rouge, LA 70801
225-381-9643

Mr. John R. Morris        (Via Videoconference)
ATTORNEY AT LAW
P.O. Box 470472
Fort Worth, Texas 76147-0472
817-262-7762

Ms. Deborah A. 'Deborah' Newman  (Via Videoconference)
NEWMAN LAW FIRM
245 W. 18th Street
Houston, Texas 77008-4005
713-942-2501

Mr. Matthew Okin          (Via Videoconference)
OKIN ADAMS LLP
1113 Vine St Ste 240
Houston, Texas 77002-1044
713-228-4100
                (CONTINUED ON NEXT PAGE)

## Page 3

(CONTINUED)

Mr. Andrew Kohl 'Drew' York     (Via Videoconference)
GRAY REED & MCGRAW
1601 Elm St. Ste 4600
Dallas, Texas 75201-7212
469-320-6114

Ms. Kathryn George              (Via Videoconference)
LATHAM AND WATKINS LLP
Chicago Office
330 North Wabash Avenue Ste 2800
Chicago, IL 60611
312-876-7700

ALSO PRESENT:
Ms. Amelia Hurt                 (Videoconference)
Mr. Jeff Pomerantz              (Videoconference)
Mr. Gregory Demo                (Videoconference)

## Page 4

I N D E X

                                                PAGE

WITNESS: MARK PATRICK

    Appearances................................   2

    Examination by Mr. Lang....................   5

    Examination by Mr. York....................  24

    Further Examination by Mr. Lang............  42

    Changes and Signature......................  44

    Reporter's Certification...................  46

    INFORMATION REQUESTED TO BE FURNISHED

              (None)

            EXHIBITS INDEX

COUNSEL FOR DUGABOY INVESTMENT TRUST

                                                PAGE

EXHIBITS                DESCRIPTION      IDENTIFIED

    1    Charitable DAF/CLO HoldCo Structure Chart    8

    2    Rand Structure Chart                         8

    3    Proposed settlement agreement               16


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

App. 067

**MARK PATRICK**
**IN RE: HIGHLAND CAPITAL MNGMT**

June 23, 2025
5–8

**Page 5**

PROCEEDINGS

MARK PATRICK,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. LANG:

Q. Please state your name for the record.

A. Mark Patrick.

Q. And, Mr. Patrick, how are you currently employed?

A. I -- what do you mean by --

Q. Who's your -- who do you work for?

A. I work for DAF entities.

Q. And when you say the DAF entities, can you be more specific into which entities that are?

A. You know, there -- it's just a group of entities that hold investment assets for charitable purposes.

Q. Specifically, do you have the names of these entities?

A. Some -- some of them such as CLO HoldCO.

Q. Anybody else?

A. Liberty, I think. Charitable DAF HoldCo Inc, US entity, Charitable DAF Fund LP. I'm probably missing several others. It's a sophisticated structure, but that's generally the gist of when I refer to DAF entities.

Q. And what about Hunter Mountain? Are you employed by Hunter Mountain?

**Page 6**

A. Well, no -- I know -- I appreciate that. I'm -- like, when I think of employment, I'm also the preferred manager for Wind Advisers, which is an investment adviser that advises investment funds -- and then -- so then I have roles and that's why when you ask about employment, you know, there's -- it's kind of a different question than roles.

Q. That's fair. Tell you what. Why don't I put up a work chart and we'll talk through it. Will that work?

A. Yeah, I'll take a look anything.

Q. Okay. Do you see this chart?

A. Yes, I do.

Q. Okay. So this is the charitable DAFs, you know, the whole structure comp chart. Do you see that at the top?

A. Yes.

Q. Okay. Is this how the DAF CLO HoldCo structure currently looks today?

A. No, it does not.

Q. Okay. What is different?

A. Well, there's a lot of differences. I'd have to kind of see the specific documentation to be exact.

Q. Well, can you generally describe the -- the changes that have been made to this flowchart?

MR. MCENTIRE: I'll object as to form and relevance.

**Page 7**

A. Yeah. I mean, I -- I think I have already, you know, with respect to the listing of entities. You'd have to show me some documents with respect to these entities and I can, you know, walk you through it.

Q. Would charitable DAF GP LLC still the GP for charitable DAF CLO Co?

A. I don't -- I don't recall precisely and I, you know, I want -- I want to be -- when I give you an answer, a hundred percent accurate.

Q. Okay. Does charitable DAF Fund LP still own a hundred percent of CLO Hold Co?

A. Yes, that is my understanding.

Q. And this charitable DAF CLO CO limited still own a hundred percent of charitable DAF Fund LP?

MR. MCENTIRE: Objection, form.

A. No.

Q. (By Mr. Lang) Okay. Charitable DAF FUND LP, is that owned by CDM CFAD LLP?

MR. MCENTIRE: Objection, form.

A. That's my general -- that's my general understanding.

Q. (By Mr. Lang) Okay. And who owns CDM CFAD LLC?

A. Yeah, again, without corporate documents that you can present to me, I -- you know -- I -- I just don't want to be inaccurate.

**Page 8**

Q. Does DFW Charities own CDM CFAD LLC?

MR. MCENTIRE: Objection, form. Relevant.

A. Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I -- I just don't want to go beyond what I have a hundred percent knowledge of.

Q. I'm sharing this charitable DAF CLO CO structure chart as Exhibit 1, to be fair. And this is a RAND structured chart, which I'm marking as Exhibit 2. Do you recognize this document?

MR. MCENTIRE: Mark, at this time he's only asking whether you recognize it.

A. Yeah, I haven't made it to the bottom, I apologize.

MR. MCENTIRE: Okay.

A. What is the question now?

Q. (By Mr. Lang) Well, do you recognize this organizational structure? Let me change the question.

A. Do I recognize this structure. Generally -- very generally.

Q. Okay. And starting at the top, charitable DAF Holdings Corp, do you see that box?

A. Yes, I do.

Q. Is that owned by CLO HOLD CO?

MR. MCENTIRE: Objection, form.

A. I don't know -- I don't know. I can't recall



**MARK PATRICK**
**IN RE: HIGHLAND CAPITAL MNGMT**

June 23, 2025
9–12

**Page 9**

precisely if there's other entities in -- in between that, you know, whether that links up to CLO Hold Co.

Q. (By Mr. Lang) Does CLO Hold Co indirectly own charitable -- charitable DAF holdings Corp.?

MR. MCENTIRE: Objection, form.

A. Yeah, again, I can't answer with accuracy here unless you showed me a corporate -- some actual corporate filings or something like that.

Q. (By Mr. Lang) Is this generally the structure for the RAND -- structure -- is it generally a structure it looks like today?

MR. MCENTIRE: Objection, form.

A. What part of the structure are you referring to, Mr. Lang?

Q. (By Mr. Lang) Well, the whole thing. Charitable DAF Holdings Corp?

A. No.

Q. Does it own Rand Advises LLC?

A. Yeah, can you restate that question, again?

Q. Does charitable DAF Holdings Corp, top box, the sole member of Rand Advisers LLC? The green box to the left.

A. Yes, that is -- that is my understanding.

Q. Okay. Does charitable DAF holdings Corp, the box at the top, is it still the sole member of Rand PD fund

**Page 10**

management LLC?

A. I would -- I would believe so.

Q. Okay. And is RAND PE fund management LLP still the general partner for RAND PE Fund One LP? See it just below it?

A. Yes, I would believe so.

Q. And then charitable DAF Holdings Corp, the box at the top, is it still the sole member for Atlas IDF GP PLLC?

MR. MCENTIRE: Objection, form.

A. Yes, I would believe so.

Q. (By Mr. Lang) Okay. And is Atlas IDF GP LLC still the general corporate for Atlas IDF LP?

MR. MCENTIRE: Objection, form?

A. Yes, I would believe so.

Q. (By Mr. Lang) Okay. And is Atlas IDF LP still the 99 percent limited partner for RAND PE FUND I LP?

MR. MCENTIRE: Objection, form.

A. I'm trying to recall because I have RAND PE FUND in a wind down situation. So I -- I don't know if that is accurate or not offhand.

Q. (By Mr. Lang) And does RAND PE FUND ONE LP still the sole member of Beacon LLC?

MR. MCENTIRE: Objection, form.

A. No.

Q. (By Mr. Lang) Okay. Who -- who owns Beacon

**Page 11**

Mountain LLC?

A. An entity called CLO HOLD CO LLC.

Q. And that's different than CLO HOLD CO limited?

A. Yes.

Q. Who owns CLO HOLD CO LLP?

A. I believe it's CLO HOLD CO limited, from my understanding.

Q. And the CLO HOLD CO LLC owned Hunter Mountain?

A. No.

Q. Who owns Hunter Mountain?

A. Beacon Mountain LLC. And I would clarify one thing. I -- it's beneficial -- it's a beneficial ownership. Hunter Mountain investment trust is a trust.

Q. Okay. I appreciate that.

A. Can you do -- if you don't mind, do a summary? I just want to make sure that we're sort of accurate here?

Q. Okay. From what I understand --

A. Yeah, from Beacon Mountain ownership. I just want to make sure you are understanding is --

Q. Beacon Mountain LLC is owned by CLO HOLD CO LLC?

A. Yes.

Q. Beacon Mountain LLC owns Hunter or -- Hunter Mountain Investment Trust is owned by Beacon Mountain LLP?

A. Yes.

MR. MCENTIRE: Objection.

**Page 12**

A. (inaudible) beneficial.

MR. MCENTIRE: Yeah, I would object to mischaracterizing his testimony.

MR. LANG: Nobody's mischaracterizing.

Q. (By Mr. Lang) The beneficial owner of Hunter Mountain Investment Trust.

A. Yeah, this is all a current state.

Q. Current state.

And what is your role with Hunter Mountain Investment Trust?

A. My understanding is I'm the -- an administrator which is a -- the control person for that trust.

Q. Are you the control person for Beacon Mountain LLP?

A. Yes.

Q. Are you the control person for CLO HOLD CO LLC?

A. Yes.

Q. Are you the control person for RAND Advisers LLC?

A. Yes.

Q. Are you the control person for RAND PE FUND Management LLC?

A. Yes.

Q. Are you the control person for Atlas IDF GP LLC?

A. Yes.

Q. Are you the control person for the Charitable DAF Holdings Corp?



**MARK PATRICK**
**IN RE: HIGHLAND CAPITAL MNGMT**

June 23, 2025
13–16

Page 13

A. Yes.

Q. And you're the control person for Charitable DAF Fund LP?

I'll -- I'll go back here.

MR. MCENTIRE: Objection, form.

Q. (By Mr. Lang) Are you the control person for Charitable DAF Fund LP?

MR. MCENTIRE: Objection, form.

A. It's -- no, but you should ask me a follow-up question.

Q. What's your role at Charitable DAF Fund LP?

A. Yeah, I'm the control person for the general partner of that limited partnership.

Q. And who's the general partner of the limited partnership?

A. Yeah, and then this is where my memory is -- is -- I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer.

MR. MCENTIRE: Yeah, Mark, let's don't -- let's don't speculate unless he has a document, okay?

A. Yes.

Q. (By Mr. Lang) Are you the control person for CDMCFAD LLC?

MR. MCENTIRE: Can you repeat the question, I didn't hear it, Mr. Lang.

Page 14

Q. (By Mr. Lang) Mr. Patrick, are you the control person for CDMCFAD LLC?

A. I believe I am.

Q. Does that stand for anything out of curiosity?

A. I don't remember.

Q. All right.

MR. PHILLIPS: Objection, formatting.

Q. (By Mr. Lang) Did you -- you negotiated the settlement agreement that is the subject of (inaudible) correct?

A. Correct.

Q. Did you initiate settlement discussion with about events?

A. What do you mean by initiate.

Q. Well, did you approach them about settlement or did they approach you?

A. I'm sorry, you were slightly muffled there.

Q. I said did they approach you about settling or did you approach them about a potential settlement?

MR. PHILLIPS: Objection to the form of the question?

A. I can't -- I can't recall offhand. Who approached who or -- yeah.

Q. Under the settlement agreement, Hunter Mountain is to receive among other things the Dugaboy note and the

Page 15

Kirschner claims. Do you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims?

A. I -- I would appreciate it if you could pull up the -- the Dugaboy note document that you are referring to. There's an awful lot of Dugaboy notes out there, and -- and as a starter and I'd also appreciate if you could pull up for me the -- what you're referring to as the Kirschner Litigation complaint.

Q. I'm referring to what's in the settlement agreement. It refers to the Dugaboy note --

A. Well, then the document speaks for itself, sir. If you want to show me the document, I'll definitely testify to the accuracy of what I signed.

Q. I'm asking if you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims as re restricted at that point out from Patricia claims as referenced in the settlement agreement.

A. Yeah, and I'm asking you to show me the settlement agreement with the lines and then I -- and I'll verify that for you if you don't mind.

There's a lot of Dugaboy notes out there you have to appreciate that, Mr. Lang.

Q. Which one have you bargained to receive in the settlement agreement?

A. And -- and there's a lot of Kirschner litigation as

Page 16

well.

Q. Well, the Kirschner litigation is that -- Styled Kirschner versus Dondero Adversary Proceeding 2103076.

Are you familiar with that one?

A. I'm not familiar with that caption. If you could just show me the document that you're -- the complaint that you're referring to, then I will say that is -- that is the litigation that -- that we negotiated for.

Q. Okay.

A. You can bring up the settlement agreement, I'll happily verify that whatever is referenced in there is what I negotiated for, but I'm not gonna broad brush generically say that I negotiated for some Dugaboy note without a little more precision, if you don't mind.

Q. Can you see my screen?

A. Here we go. Yes.

Q. Okay. When I refer to the Dugaboy note, that's the note that I'm referring to. Does that help you?

MR. MCENTIRE: Well, for the record, Mr. Lang, can we just identify that you have put up the actual settlement agreement, is that correct?

MR. LANG: Yes. Sorry. Exhibit 3 will be the settlement agreement. The proposed settlement agreement.

A. Yes, so you're having me refer to the Dugaboy note dated May 31st, 2017, with a face amount of roughly



ESQUIRE
DEPOSITION SOLUTIONS

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S    Document 51   Filed 07/08/26   Page 109 of 167   PageID 875
Appendix   Page 109 of 131

Case 19-34054-sgj11   Doc 4608-61   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc
Exhibit 58   Page 13 of 13

**MARK PATRICK**
**IN RE: HIGHLAND CAPITAL MNGMT**

June 23, 2025
45–47

## Page 45

I, MARK PATRICK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
MARK PATRICK

THE STATE OF TEXAS
COUNTY OF _____
Before me, _____, on this day personally appeared MARK PATRICK, known to me (or proved to me under oath or through _____)(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.
Given under my hand and seal of office this _____ day of _____, 20___.

_____
Notary Public in and for
the State of Texas

## Page 47

in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.
Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be certified to after they have occurred.

Certified to by me this 23rd day of June, 2025.
_____
Ida Alcala, CSR#12565
CSR Expiration Date: 12/31/26
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008

FURTHER CERTIFICATION UNDER RULE 203 TRCP
The original deposition was/was not returned to the deposition officer on _____, 2025.
If returned, the attached Changes and Signature page contains any changes and the reasons therefor;
If returned, the original deposition was delivered to Mr. Mcentire, Custodial Attorney;
That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;
That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.
Certified to by me this _____ day of _____, 2025.
_____
Ida Alcala, CSR#12565
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008
CSR Expiration Date: 12/31/26

## Page 46

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
                                        §
In re                                   § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P,  § Case No. 19-34054-sgj11
Reorganized Debtor.                     §
                                        §
REPORTER'S CERTIFICATION
DEPOSITION OF MARK PATRICK
JUNE 23, 2025
I, IDA ALCALA, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARK PATRICK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, 2025, to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2025;
That the amount of time used by each party at the deposition is as follows:

        Mr. Lang  :  (00:28)
        Mr. York  :  (00:27)
That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:
Mr. Michael Lang, Attorney for Dugaboy Investment Trust.
Mr. Sawnie Mcentire, Attorney for Mark Patrick.
Mr. Drew York, Attorney for Patrick Daugherty.
I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action



800.211.DEPO (3376)
EsquireSolutions.com

**App. 071**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | June 25, 2025 |
|  | ) | 9:30 a.m. Docket |
| Reorganized Debtor. | ) |  |
|  | ) | - MOTION TO EXTEND DURATION OF |
|  | ) |   TRUSTS (4213) |
|  | ) | - MOTION TO APPROVE SETTLEMENT |
|  | ) |   (4216) |
| _____ | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Highland Capital        John A. Morris
Management Claimant Trust:  PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7760

For the Highland Capital        Hayley R. Winograd
Management Claimant Trust:  Gregory V. Demo
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            1700 Broadway, 36th Floor
                            New York, NY  10019
                            (212) 561-7732

For the Highland Capital        Jeffrey N. Pomerantz
Management Claimant Trust:  PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067
                            (310) 277-6910

For Marc S. Kirschner,      Robert Scott Loigman
Litigation Trustee:         QUINN EMANUEL URQUHART & SULLIVAN,
                             LLP
                            295 5th Avenue
                            New York, NY  10016
                            (212) 849-7000

App. 072

Seery - Direct                                              99

the Cayman Islands?

A    I hesitate to say generally aware.  I'm aware that there's a proceeding in the Cayman Islands about involving a blocker corp.  And there's disclosure in this Court about what that entity is.  It's a blocker corp. in the Caymans that prevents the ultimate charitable entities -- and I put that in quotes -- to -- from receiving UBTI, which is Unrelated Business Income.  And in that case, they would have to pay tax on it, and the idea is that they don't want to pay taxes and they don't pay taxes.  So that corp. apparently is in some sort of proceeding.  That's on the DAF side.  That is not on the HMIT side.

Q    Okay.  So, based on the work that you did and the documents that you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT entities?

A    Yes.

Q    And what view did you reach?

A    He has complete authority over each of these entities. They run up to entities that he controls or he owns.  And he's had that, and it's the structure that was set up a long time ago, and any changes to that structure are just consistent with the documents that let him do these things.  And the proceeding in Cayman, whatever that is, has no impact on Mr. Patrick's authority over these entities or any of the entities

Patrick - Direct                                    174

correct?

A      Correct.

Q      And CLO Holdco, LLC is owned by CLO Holdco, Limited?

A      That's correct.

Q      And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?

A      Correct.

Q      And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

A      The ultimate beneficial owner is DFW Charitable Foundation.  To my -- to the best of my recollection, I would say that appears accurate.  I'm just not a hundred percent.

Q      Okay.  And --

A      But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner.  And I'm a hundred percent that Dugaboy Investment Trust has no interest in it.  And I'm also a hundred percent that The Dallas Foundation or any --

          MR. LANG:  Judge, I haven't asked --

          THE WITNESS:  -- or any other nonprofit has any --

          MR. LANG:  -- any of these questions.

          THE COURT:  Okay.  There's an objection, nonresponsive.  I sustain.

BY MR. LANG:

Q      Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?

A      (Pause.)  I'm just waiting for a relevancy.  I don't

Patrick - Direct                                          182

Q    And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?

A    Around the end of March of 2025.  I believe.

Q    And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?

A    What do you mean by involved?  How?

        THE COURT:  Okay.  I can see what's happening here or I have an impression of what's happening here.  I feel like you're slowing down this process where I've given 30 minutes to this lawyer.  Okay?  And I feel like you're feigning confusion.  I don't mean to be insulting, but that's how it comes across.  Okay?  So I need you to speed up your answers and not be confused about things you shouldn't be confused about.  Okay?

        THE WITNESS:  Okay.

        THE COURT:  I feel like it's late 1980s *Dondi*.  Does anyone know what I mean by that?  Okay.  We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling.  That's what they did in *Dondi*.  Confusion.  Delay.  Okay?

    So I don't mean to chastise you.  I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this.  Okay?

263

comments on the record, and to the extent that Your Honor wants to amend that, you'll do so at your leisure?

THE COURT:  Yes.

MR. MORRIS:  Perfect.

THE COURT:  All right.

MR. MORRIS:  Thank you.

THE COURT:  Thank you all.  We're adjourned.

MR. PHILLIPS:  Thank you, Your Honor.

THE CLERK:  All rise.

(Proceedings concluded at 4:38 p.m.)

--oOo--

CERTIFICATE

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

 **/s/ Kathy Rehling**                                    **06/27/2024**

_____     _____
Kathy Rehling, CETD-444                              Date
Certified Electronic Court Transcriber

```
                IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

 IN RE:                             .  Case No. 19-34054-SGJ-11
                                    .
HIGHLAND CAPITAL MANAGEMENT,        .  Chapter 11
L.P.,                               .
                                    .
           Debtor.                  .
                                    .  Monday, May 11, 2026
. . . . . . . . . . . . . . . . . . .  9:06 A.M.



                    TRANSCRIPT OF HEARING ON
   MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO
 COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER
               DUGABOY INVESTMENT TRUST (4513)
            BEFORE THE HONORABLE BRAD W. ODELL
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor, Highland Capital Management:

                        Pachulski Stang Ziehl & Jones LLP
                        BY: JOHN A. MORRIS, ESQUIRE
                        1700 Broadway, Suite 36th Floor
                        New York, New York 10019

                        Pachulski Stang Ziehl & Jones LLP
                        BY: JEFFREY POMERANTZ, ESQUIRE
                        10100 Santa Monica Boulevard
                        13th Floor
                        Los Angeles, California 90067

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder:        Nicholas Noble
                       Earle Cabell Federal Building
                       501 West 10th Street
                       Dallas, Texas 75242

Transcription Service: Liberty Transcripts
                       9107 Topridge Drive
                       Austin, Texas 78750
                       (847) 848-4907
                       DBPATEL1180@GMAIL.COM
Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

App. 077

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/08/26   Page 116 of 167   PageID 882
Appendix   Page 788 of 131

71

MacInnis - Direct/Edney

Q    Is that the Charitable DAF Fund, LP?

A    Charitable DAF Fund, LP.  Yes.

Q    Okay.  And we mentioned that you're a court-appointed liquidator of that company.  Is that right?

A    Yes.  I was appointed on May 6 pursuant to an order from the Cayman court.

Q    So I didn't really know about the court liquidator until I encountered this case.  Could you tell me a little bit more about what a court-appointed liquidator in the Cayman Islands is?

A    Broadly, it's -- your appointment comes about when a -- in an insolvent case when a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company.  In a case like this, broadly my role will be to secure and protect the assets of the company.  Often in cases where there's been misappropriation or fraud, that activity is quite involved because you have to trace the assets and look to enforce and recover them.

     Once I have the assets in the estate, I do an exercise to adjudicate the claims that are filed in the estate.  And then if there are funds available for distribution, I would distribute those funds.  So those are the broad categories. There are a lot of other elements of the liquidation, but those broadly are the are the functions.

Q    All right.  And I think you mentioned when you were

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Appendix   Filed 07/03/26   Page 117 of 167   PageID 883

72

MacInnis - Direct/Edney

appointed in this position.  Could you restate that again?

A     That was on May 6.

Q     What were the circumstances that led to your appointment?

A     As I understand it, the supporting orgs of the Charitable DAF Holdco petitioned the court for a just and equitable winding up of the Charitable DAF Holdco largely on the basis of concerns of misappropriation of the assets of the structure.

Q     You mentioned the term the supporting organizations. Could you tell us what your understanding of what those are?

A     So the Limited Charitable DAF Holdco is a hundred percent shareholder in the Charitable DAF Fund, LP.  And the supporting organizations, which include the Dallas Foundation, the Kansas City Foundation, and the Santa Barbara Foundation, and the Community Foundation of North Texas, they are the participating shareholders of CDAF Holdco.

Q     And what do you think your court-appointed mission is with respect to the Charitable DAF (indiscernible)?

A     Well, it is to recover the assets of the estate and administer them for the benefit of the economic stakeholders in the company.

Q     As a court-appointed liquidator for the Charitable DAF Holdco, Ltd., do you have the power to bring claims against other parties?

A     I do have the power to bring proceedings by Cayman law statute and with the sanction of the Cayman court.

App. 079

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/28/26131   Page 118 of 167   PageID 884

73
MacInnis - Direct/Edney

Q    And did you bring any proceedings against Mark Patrick?

A    Yes.  We filed a statement of claim on July 15 in the Cayman court.  The process to do that, I had to first seek sanction of the what I'm going to refer to as the liquidation judge, the judge that supervises my position and authority in CDAF Holdco.

I sought permission from him to bring these -- to bring this claim.  And then once I had permission to bring it, I then filed it on July 15th.  And that proceeding was assigned to Justice Parker, so it's not the liquidation judge that reviews and considers the statement of claim.  It's Justice Parker. And the claim is presently I think paused, stayed pending the outcome of the injunction application that we filed off the back of our statement of claim.

Q    Okay.  What if anything did you have to show the liquidating judge in order to initiate litigation (indiscernible)?

A    The liquidation judge would expect that I need to show that I have reasonable prospects of success on that claim.  And practically speaking, that usually entails and it did in our case providing an expert opinion from a King's counsel an, independent King's counsel, on the merits of the case.

We're also required, I have a duty to present not only the reasons I feel that there's a reasonable prospect of success but also any material weaknesses or considerations of my claim

App. 080

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Appendix   Filed 07/03/26   Page 119 of 167   PageID 885

74
MacInnis - Direct/Edney

so that the judge has that all before him.

Q    And did you provide opinions of King's counsel?

A    Yes, we did.  And we received sanctions so.

Q    Now towards the latter half of your answer a couple of questions ago, you started talking about the status of the Cayman proceedings.

A    Yes.

Q    Could you give us a brief overview of that?

A    So we filed the initial claim on July 15th.  The judge set down and then we filed our -- I don't recall the date exactly but shortly thereafter an application for injunctive relief that was set down for December 15 and 16 in the Cayman Islands.

We filed an amended statement of claim on October 15.  The matter was heard for the injunction on December 15th and 16th. In February, Justice Parker issued his ruling which found that we have a serious issue to be tried.  That's the threshold for seeking injunctive relief.  He denied our injunction on the basis he didn't consider our proprietary interest went as far as we said it did in the application.  And so he found on the balance of convenience that it was in favor of the defendants.

We appealed that decision.  We were in front of the Court of Appeal on an interim application for injunctive relief. They also affirmed there is a serious issue to be tried and granted the interim relief.  And the main injunction action is pending for September 2nd and 3rd.

Case 19-34054-sgj11    Doc 4684-1    Filed 06/29/26    Entered 06/29/26 23:26:09    Desc
Case 3:22-cv-00203-S    Document 51dix FilPage7344261131 Page 120 of 167    PageID 886

75

MacInnis - Direct/Edney

Q    Okay.  And what was the interim relief that you secured from the Court of Appeals?

A    In the Court of Appeals, we essentially have -- there is to be no transfer, dissipation, withdrawal, removal apart from the ordinary course of business from any of the defendants. And there is also a limitation on no increases and remuneration can be made in this period and DFW is limited to $200,000 a month in distributions.

Q    Just bear with me for a minute.

Okay.  So there's a -- you mentioned that there's a limitation on what Charitable DAF Holdco can do with certain assets during the pendency of (indiscernible).  Is that right?

A    Yes, that's correct.

Q    And does that apply to assets that is held directly by Charitable DAF Holdco or (indiscernible)?

A    Well, because our injunction is against CLO Holdco, all of -- all of the assets in that structure and anything under CLO Holdco would be caught by the terms of that injunction.

Q    And what are the limitations that this injunction places upon those assets?

A    In layman's terms, it essentially keeps those assets safe from being dissipated, removed, transferred, diminished, any sort of transaction that would put them further away from this structure except they are allowed to do -- make payments in the ordinary course.

App. 082

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document Appendix Filed 06/03/26131 Page 121 of 167   PageID 887

76

MacInnis - Direct/Edney

Q    So if an asset is held under this structure and Mr. Patrick decided to sell them or trade them away or settle claims, would he need the Cayman court's permission?

A    It would be a -- it would be a breach of the injunctive relief if he didn't have the permission to do that and it's outside of the ordinary course of business, yes.

Q    And did Mr. Patrick oppose the imposition of this interim relief?

A    Well they -- yes, it was -- the interim relief hearing was opposed by the defendants.

Q    And his objection was (indiscernible).  Is that correct?

A    Yes.

Q    Now did -- now with respect to the Cayman proceedings, did you take any actions to bring them to the attention of the courts in the United States?

A    We were also -- filed our application for recognition Chapter 15, so our statement of claim was exhibited to that application.  I believe that was done on July 25th.

Q    And where is that application pending?

A    It's in Delaware.

Q    As a liquidator of the Charitable DAF Holdco, Ltd., do you have a special ability to obtain documents that are related to that company?

A    Yes, I have the power to compel the production of documents certainly from service providers in the Cayman

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Appendix Filed 07/08/26131   Page 122 of 167   PageID 888

77

MacInnis - Direct/Edney

Islands.  A Chapter 15 recognition would also give me the subpoena powers in the United States for any third parties who are here who have books and records belonging to Holdco.

Q    And does that include documents that with respect to other third parties might be considered confidential or privileged?

A    Yes, I can -- if they're the documents of Holdco which we have obtained some, we're still in the process of getting parties to cooperate and provide their documents.  But we receive, for example the lawyers acting for Holdco would be compelled to provide us with the information belonging to Holdco.

Q    Is that because you're practically in charge of Holdco now?

A    Yeah, I step into the shoes of the company.  I replace the directors and others who have power.

Q    And prior to being appointed a liquidator, would you have been able to have obtained access to some of these otherwise confidential documents?

A    No, no it would be private company information.

Q    When were you first able to gain access to some of these confidential documents?

A    We started getting documents within the early days, the first few days of our appointment.  That process is usually fairly involved, you'll appreciate it.  Oftentimes the records of Cayman Islands companies aren't held in the Cayman Islands.

App. 084

MacInnis - Direct/Edney

But for those parties who were there and we were able to ask them for the books and records and they cooperated.  There were a number of parties who did not cooperate.

Q    And when did you start making some of these confidential documents publicly accessible?

A    We made the documents in connection with the statement of claim public when we filed in Chapter 15.  I believe also that -- in the Cayman Islands, documents aren't going to become public unless they do something like file them in the Chapter 15 proceeding, until they're brought up in court or mentioned in court.  And then that lifts the sort of privacy rules governing Cayman proceedings.

So some of those documents wouldn't have been capable of being referred to publicly until we held the injunction hearing in December.

Q    December of 2025?

A    December 15, 16 was the injunction hearing in Cayman.

Q    So some of the documents you obtained you were able to make public when you filed them as an attachment to the Chapter 15 recognition proceeding?

A    Yes.

Q    And you filed that -- do you remember what date that was?

A    That was July 25th.

Q    July 25th --

A    Yes.

App. 085

Case 19-34054-sgj11    Doc 4684-1    Filed 06/29/26    Entered 06/29/26 23:26:09    Desc
Case 3:22-cv-00203-S    Document 51    Filed 07/88/26131    Page 124 of 167    PageID 890
Appendix    Page 88 of
85

MacInnis - Direct/Edney

those entities with the Charitable DAF Holdco?

A    They are the -- they hold the economic benefit of Charitable DAF Holdco from Charitable DAF Holdco's inception. It was these four charities.  I think Community Foundation of Texas was added after the first three in that list, but all four of them were for the -- up until the restructuring, were the sole economic interests in the Charitable DAF Holdco.

Q    Now you mentioned the restructuring.  Was there a restructuring that occurred with this chart of entities?

A    Yes.  That's what is behind our statement of claim.  We've alleged or impugned this restructuring for --

Q    Maybe you should stop.  Let me ask --

A    Okay.

Q    -- (indiscernible).

A    Okay.

Q    Okay.  And do you have a sense of what time period during which that restructuring occurred?

A    I believe it started around the planning for the late December, late 2023, and the bulk of the transactions and documents supporting it from December 2024 to March 25th or 27th, 2025.

Q    Based on your investigation and your work as liquidator, do you believe this chart is an accurate understanding of how the DAF Entities were organized prior to the restructuring (indiscernible)?

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Appendix   Filed 07/03/26   Page 125 of 167   PageID 891

86

MacInnis - Direct/Edney

A     Yes.

Q     And why do you believe so?

A     Based on the review of documents since our appointment, we were able to confirm how DAF Holdco did hold its interest in Charitable DAF Fund and the general partner arrangements.

Q     And do you have an understanding based on your role as liquidator of the amount of assets that was held under this structure prior to the restructuring?

A     I'll broadly refer to it as it was roughly $270 million at various points.  I think it was somewhat below that and somewhat above that.

          MR. EDNEY:  All right.  Let me put this demonstrative aside for a moment and look at the Slide 4 of the demonstrative, please.

     (Pause)

BY MR. EDNEY:

Q     So, I'm showing you Slide 4 of our demonstrative chart. Did there come a point where the general partner of the Charitable DAF Fund, LP was changed?

A     Yes.  Yes, it was.

Q     Okay.  And what's your -- do you have an understanding of the relationship between the general partner and the limited partnership?

A     Yes.  The general partner is the one that controls the decisions and the management of the fund.

App. 087

MacInnis - Direct/Edney

Q    And then I guess the general partner is distinguished from the limited partners.  Is that right?

A    Yeah.  The general partner has the -- would hold the 100 percent of the management share, so it can affect control and voting of the structure.  The limited partners, they have the participating shares or interest, so they get the economic benefit, but the general partner is the one that makes all the decisions about how funds are invested and used.

Q    Now, the change in the identity of the general partner, from what entity to what entity did it change?

A    I think it changed from what was called Charitable DAF General Partner to CDH GP.

Q    And where was that new general partner (indiscernible)?

A    Here on your chart, it says Cayman Islands.

Q    But do you have an independent awareness of that?

A    I've seen it on the documents that we obtained.

Q    And based on your investigation, who is in charge of this new entity, CDH GP, Ltd.?

A    Mark Patrick and Paul Murphy.

Q    And tell me a little bit more about that, if you have any knowledge.

A    I only understand them to have been in control of and appointed over CDH GP.

Q    Okay, all right.  I'm going to show you -- let's just see if I can just check my chart here for a second to see if this

App. 088

MacInnis - Direct/Edney

exhibit.

Earlier, we talked about some of your efforts to obtain documents from service providers and DAF companies.  Is that right?

A    Yes.

Q    Were you able to obtain documents relating to a law firm called the Shields Law Firm?

A    Yes.  I believe we've obtained some, but not all.

MR. EDNEY:  Okay.  Let's pull up Exhibit 169.

BY MR. EDNEY:

Q    I'm handing you what's been --

MR. MORRIS:  (Indiscernible).

THE COURT:  I mean, he hasn't offered it into evidence, so when he --

MR. MORRIS:  He's showing it to the witness.

THE COURT:  I mean, how else is he going to lay a foundation without showing it to the witness?

MR. MORRIS:  I won't make suggestions (indiscernible).

BY MR. EDNEY:

Q    I'll show you what's been marked as Movant's Exhibit 169.  Do you recognize this document?

A    Yes.

Q    And do you -- what is it?

A    It's an email between Shields and Mark Patrick in relation

App. 089

MacInnis - Direct/Edney

to a query from Walkers about how they want the new Cayman GP

to be structured, whether a Cayman LLC or an exempted company.

Q    Did you obtain this document in the course of your duties

as liquidator?

A    I've seen it before so, yes, I believe I have.

Q    And do you know whether it was included as an exhibit to

one of the affidavits that you filed in the Cayman proceeding?

A    There were a number of exhibits attached to that, so I

can't recall specifically where it was in the statement of

claim.

Q    How did you obtain this document, Ms. MacInnis?

A    Well, we obtained, as I said, some discovery in books and

records from Shields, from Walkers themselves, so it could have

been from Mr. Patrick as well filed evidence in the Cayman

proceedings.  So without seeing my own document log and

reference, I can't confirm specifically which exhibit or in

which production it came through.

Q    Okay.  Do you recognize the name Brandon Schaller --

A    Yes.

Q    -- on the top of the email?  Who's that?

A    An attorney who works for Shields.

Q    Okay.  And if you scroll down to the second email, this is

an email from an address with the name Mark Patz and Patrick

Patz (indiscernible). com.  Do you see that?

A    Yes, I do.

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Appendix   Filed 07/03/26   Page 129 of 167   PageID 895

106

MacInnis - Direct/Edney

Exhibit 8.  Ms. MacInnis, I'm showing you what's been previously admitted as Exhibit 8.  This is a certificate of incorporation of DFW Charitable Foundation, a nonprofit stock corporation.  Do you see that on the first page?

A    I do.

Q    Is this a document that you gathered in the course of your investigation?

A    Yes.

Q    Do you know what it is?

A    Yes.  It's -- it incorporates DFW and confirms that, I was correct, it was formed in the State of Delaware.

Q    Do you have an understanding of where DFW Charitable Foundation is headquartered?

A    I understand it's at Mark Patrick's residence.

Q    And do you have an understanding as to Mr. Patrick's role in DFW Charitable Foundation?

A    Nothing more than I understand him to be named as the director and holder of the shares of DFW.

Q    Let's move on to Movant's Exhibit 43 which is not in evidence.  Ms. MacInnis, just in the manner of some preliminary questions, in the course of your investigation, did you gather the business records of Charitable DAF Holdco and use them?

A    Yes.

Q    And did that include resolutions of the board of directors of Charitable DAF Holdco?

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document Appendix Filed 07/08/26131 Page 130 of 167   PageID 896

115

MacInnis - Direct/Edney

If we could scroll to the second page.

BY MR. EDNEY:

Q    The second email there dated November 26, 2024 at 4:11 p.m., if you can just take a moment to read that, and I'll read it into the record, as well.

"If new participating shares are issued to a nonprofit and say (indiscernible) tried to implement an equitable winding down of the company, do the new shareholders object.  Will that help?  Also, what could possibly be the basis for any equitable liquidation of the articles if the articles don't give such rights?"  Do you see that?

A    Yes, I do.

Q    Are you familiar with this passage?

A    Yes.

Q    What is your understanding of some of the efforts to issue new shares to DFW Charitable and restructure this company?

A    The dilution of the supporting org's interest in the structure would make it very difficult for them to bring a winding-up petition and have the ability to cause the company to be either wound up, or to prevent a winding-up.  They wouldn't have enough economic interest to sway that sort of application.

Q    All right.  Let's move on to Movant's Exhibit 45.  I do believe this document has --

        THE COURT:  I show this on my list of agreed-to

App. 092

Case 19-34054-sgj11    Doc 4684-1    Filed 06/29/26    Entered 06/29/26 23:26:09    Desc
Case 3:22-cv-00203-S    Document 51  Filed 07/03/26131  Page 131 of 167    PageID 897
Appendix  Page 105 of 131

123

MacInnis - Direct/Edney

A    They were very clear it couldn't be used to support or justify the fairness of the transaction being proposed.

Q    And based upon your review of the business records of Charitable DAF Holdco, did that limitation on use ever change?

A    Not that I'm aware of.

Q    After speaking with PricewaterhouseCoopers and after speaking with FTI Consulting, did Charitable DAF Holdco move on to another valuation company?

A    I understand they used ValueScope.

Q    Let's go to previously admitted Movant's Exhibit 12.  I'm handing you what's been marked as a valuation analysis of certain participation shares of the Charitable DAF Holdco, Ltd., as of March 25th, 2025.  Do you see that?

A    Yes, I do.

Q    Do you recognize this document?

A    Yes, I do.

Q    What is it?

A    It's the valuation used to support -- to put structure in the transaction.

Q    And based upon your investigation and review of this document, what conclusions did ValueScope reach about the value of the org charitable institutions that historically had been in charge of Charitable DAF Holdco as of March 25th, 2025?

A    They reached the conclusion that they were entitled to $1.6 million in total from the assets of that structure.

MacInnis - Direct/Edney

Q    And in your role as liquidator, were you in a position to review previous valuation efforts by ValueScope?

A    Yes.  We looked at the September -- even earlier today we looked at the September 2024 -- 2024 valuation.

Q    And did you see even others beyond that?

A    Yes, I have.

Q    Had ValueScope ever valued the stake of the four charities that (indiscernible) 1.61 million before?

A    No.  They had generally been in the ballpark of 270 million.  And the discount provisions sort of ranged between 10 and 30 percent, whereas this one is materially different from the others on the basis that the valuation method changed and the level of discount changed.

MR. EDNEY:  Perhaps if we could scroll down to the summary chart of ValueScope's conclusions.  Just one up, please.

BY MR. EDNEY:

Q    So directing you to what's Page 46 of the electronic document that has a fair market value conclusion, and you see down at the bottom in bold subject interest.  Can you read that number for me?

A    It's 1.6 -- 17,000, 1.6 million, 17 thousand and --

Q    Is that what it is?  Maybe we can blow that up a little bit.

A    Sorry.  If you mean the one per share, it's the per share

App. 094

MacInnis - Direct/Edney

valuation was $5,368.  But the total interest for the original

SOs was 1.6 million.

Q    Can you give us the exact number, please?

A    1,637,192.

Q    Now, in the course of your investigation, were you -- did

you reach a conclusion about whether this March 25th ValueScope

valuation was reconcilable with ValueScope's previous

valuations of the (indiscernible) shares?

A    I did.

Q    And what was that conclusion?

A    That it isn't.

Q    And why not?

A    As I said, it changed the valuation approach, the discount

assumptions that are the subject matter now of our statement of

claim, and a matter to be resolved by the Cayman court.

Q    Now, as of March 25th, 2025, the date of this valuation,

had the assets under the DAF management changed in any

significant magnitude?

A    No.

Q    And as of that date, what was your understanding of how

many assets were underneath the DAF?

A    My understanding is the corpus of that structure and the

assets was about $270 million.

Q    Let's move to -- well, let me ask you this.  This

ValueScope valuation, did you obtain this in the course of your

Case 19-34054-sgj11    Doc 4684-1    Filed 06/29/26    Entered 06/29/26 23:26:09    Desc
Case 3:22-cv-00203-S    Document 51    Filed 07/08/26    Page 134 of 167    PageID 900
Appendix    Page 107 of 131

126

MacInnis - Direct/Edney

work as a liquidator?

A    Yes, I did.

Q    And was this one of the confidential documents that you were only able to gain access to by stepping into the shoes of the Charitable DAF Holdco?

A    Yes.

Q    Let's move to Movant's Exhibit 48, which appears to have been previously admitted.  So I'm handing you what's been previously admitted as Movant's Exhibit 48.  It's the redemption amendment number two dated March 27, 2025.  Do you see that?

A    Yes.

Q    And it's on behalf of CDMCFAD, LLC.  Do you see that?

A    Yes.

Q    Are you familiar with this document?

A    Yes.

Q    What do you understand it to be?

A    I understand it to be the step that redeemed Holdco from its interest in CDMCFAD.

Q    And redemption and amendment agreement, it was -- what was the date of it again?

A    March 27th, 2025.

Q    And how long after the ValueScope evaluation was that?

A    ValueScope, was it March 25th?

Q    Yes.

MacInnis - Direct/Edney

A    I want to direct your attention to the third paragraph of Page 1, starting with, "Whereas, in accordance with the terms of this LLC agreement."  Do you see that?

A    Yes.

Q    It says a manager desires to redeem the entire limited liability company interest in the company currently held by Charitable DAF Holdco of the effective as of the effective date of $1,647,192.  Do you see that?

A    Yes.

Q    Now, what was the economics of this redemption transaction?  Who, if anyone, got paid what through this?

A    This resulted in Charitable DAF Holdco being completely divorced from the assets in the estate, and it received $1.6 million and change in that exchange.

Q    And Charitable DAF Holdco, who were the economic beneficiaries of that company?

A    In Holdco, it was the four supporting orgs and DFW.

Q    And when did DFW come to have a stake in Charitable DAF Holdco?

A    Off the top of my head, I think that was the resolution looked at in February.

Q    Now, after this redemption, where were all the assets held that used to be in the DAF structure?

A    They were still in CDMCFAD, and then held, one of your earlier charts shows still all held through CL Holdco.

App. 097

MacInnis - Direct/Edney

Q    All right.  Let's turn to Slide 9 of the demonstrative, please.  I'm handing you part of our demonstrative exhibit, Slide 9.  It has a series of charts on it, DFW Charitable Foundation at the top.  CDMCFAD, LLC below that.  Do you see that?

A    Yes, I do.

Q    After the redemption of the stake of Charitable DAF Holdco, Ltd. and CDMCFAD, what stake did the four original charities have in the $270 million in assets in the DAF structure?

A    They're left with nothing.

Q    And what organization had the economic interest in those assets after the redemption that we just referenced?

A    DFW.

Q    And were there any other organizations that had such interest?

A    No.

Q    Turning back to -- and let's just stay there for a second, on Slide 9.  Do you regard Slide 9 as an accurate representation of the current structure of the DAF after the redemption event that we just talked about?

A    Yes.

Q    Let's turn back to Slide 7.  So I'm showing you Slide 7 that refers to Charitable DAF Holdco, Ltd. down at the bottom. And then it has the familiar supporting and other historical

App. 098

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/08/26   Page 137 of 167   PageID 903
Appendix   Page 108   131

129

MacInnis - Direct/Edney

charitable foundations at the top.  Do you see that?

A    Yes.

Q    After the redemption even that we just referenced, what stake did Charitable DAF Holdco, Ltd. have in the $270 million in assets of the DAF structure?

A    It didn't have any.

Q    And what did it receive for that?

A    One-point-six million.

Q    And for that 1.6 million in cash, which entities had a stake in that now?

A    That would be the four supporting orgs, excluding DFW.

Q    And even in that 1.6 million, DFW Charitable Foundation had a stake in 50 percent of that?  Is that right?

A    No.  The 1.6 represents the stake for the SOs.

Q    Okay.  And then, so after this transaction, what was the Dallas Foundation and the Highland Dallas Foundation left with in terms of assets?

A    They don't have any recourse or access to these funds in the Charitable DAF structure.

Q    Do they have any portion of the 1.6 million?

A    They received the -- that was divided as between them.  So I don't have the exact allocations.  I think it was on the ValueScope summary.

Q    At the end of this process, Ms. MacInnis, what was the sum of effect of the restructuring on these four historical

charities?

A    They lost their economic interest and right to distributions from the 270 million in the structure.  And as I understand it, you know, they, each of them had multi-year grant obligations and charitable works that they were contributing to using the distributions from the structure. And they'd been left in serious straits, not being able to fund those projects.

Q    And the Dallas Foundation, was that a charitable organization that was founded in just the last couple years?

A    No.  As I understand it, it's been around for a century.

Q    And do you have similar views with respect to the other four?

A    Yes.

Q    All right.  Ms. MacInnis, in your role as liquidator, you had access to the communications that were going out of the Charitable DAF Holdco structure?

A    Yes.

Q    And in your role of liquidator, did you see any evidence that these four charities were informed of the redemption and the shift of their interest from 270 million to 1.61 million when it happened?

A    No, I did not.

Q    Now, in the course of your investigation, did -- have you inquired into what Mr. Patrick had been paid by various DAF

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/03/26   Page 139 of 167   PageID 905
Appendix   Page 108 of 131

131

MacInnis - Direct/Edney

Entities over the course of the last few years?

A    Yes, I have.

Q    And what did you do to determine the source and amount of this compensation over that period?

A    We received information in connection with the disclosures of our injunction that was in place from the end of July to early January.  And from the disclosure of various cash outlays from the structure, we were able to determine what amounts had been paid to Mr. Patrick and Mr. Murphy.

Q    And did you develop a view, based on your investigation, of how much Mr. Patrick was paid by the entities in the calendar year of 2024?

A    Yes.

Q    And what was that view?

A    I don't have the exact numbers in front of me, but it's set out in our statement of claim.  But it was substantial increases in remuneration were paid out to Mr. Murphy and Mr. Patrick from the end of 2024 through 2/2025.

Q    And was that amount in excess of $10 million?

A    Yes.

Q    Was it in excess of $13 million?

A    Yes.  I believe the total was 18, 18 million and change. But I don't recall the exact figure.

Q    And was there a short period of time in September or October of 2024, where these payments were concentrated?

MacInnis - Cross/Morris

Dugaboy at this time?

A    Well, Michael Edney.

Q    No, no.  I apologize.  I don't mean now.  Going back from the -- around the time of your appointment, do you recall being in communication with other lawyers from there?

A    For Dugaboy, I don't know.  I don't know who those lawyers would be.

MR. MORRIS:  Okay.  Is there a way to call up Dugaboy Exhibit 206?  It's a very large exhibit.

(Pause)

THE COURT:  Mr. Morris, let me ask you real quick while they're pulling this up.  How much longer do you anticipate --

MR. MORRIS:  About ten minutes.

THE COURT:  Okay.  All right.  Ms. MacInnis, are you good for ten minutes?

THE WITNESS:  Yes.

THE COURT:  I know you've been on the stand for a while.  We could -- so --

(Counsel confer)

MR. MORRIS:  Thank you everybody for your patience.

BY MR. MORRIS:

Q    Okay.  So, again, your investigation begins on May 8th. And you receive, this is a letter dated -- I apologize.  Your investigation begins on the 6th.

App. 102

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/05/26   Page 141 of 167   PageID 907
Appendix   Page 105/26 131

173

MacInnis - Cross/Morris

A     The 6th, yes.

Q     And this letter's dated on the 8th.  Do you see that?

A     Yes.

Q     And you see that the author of the letter, tells you that she represents the Dugaboy Investment Trust, NexPoint?

A     Yes.

Q     Again, Dugaboy has no relationship to Holdco, correct?

A     No.

Q     And to the best of your knowledge, Dugaboy has no relationship to any of the DAF Entities, correct?

A     Yes.

Q     And that they're writing to you as the official liquidator of Holdco to provide information to you against Mr. Patrick. Is that right?

A     Yes.

Q     And the supporting organizations sit on Holdco's liquidation, correct?

A     Yes, they do.

Q     And they sat on the Holdco liquidation committee since, I think you said July 9th?

A     July 7th.

Q     July 7th.

A     7th.

Q     Since early July, right?  So the liquidation committee -- was the liquidation committee provided with a copy of the

App. 103

Case 19-34054-sgj11    Doc 4684-1    Filed 06/29/26    Entered 06/29/26 23:26:09    Desc
Case 3:22-cv-00203-S    Document 51    Filed 07/08/26    Page 142 of 167    PageID 908

275

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

_____

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts                    Date:  May 15, 2026

App. 104

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj11** |
|  | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL | ) Lubbock, Texas |
| MANAGEMENT, L.P., | ) May 12, 2026 |
|  | ) 9:00 a.m. Docket |
| Reorganized Debtor. | ) |
|  | ) MOTION TO RECONSIDER (4513) |
|  | ) OBJECTION (4535) |
|  | ) JOINDER TO OBJECTION (4537) |
|  | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRAD W. ODELL,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Reorganized        John A. Morris
Debtors:                   PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7760

For The Dugaboy            Michael J. Edney
Investment Trust:          MORGAN LEWIS
                           1111 Pennsylvania Avenue, NW
                           Washington, DC  20004
                           (202) 739-3000

For Mark Patrick, et al.:  Louis M. Phillips
                           KELLY HART & PITRE
                           301 Main Street, Suite 1600
                           Baton Rouge, LA  70801
                           (225) 381-9643

For Highland Capital       Joshua Seth Levy
Management, et al.:        WILLKIE FARR & GALLAGHER, LLP
                           1875 K Street, NW
                           Washington, DC  20006
                           (202) 303-1147

Patrick - Direct                              29

the question without divulging any privileged communication, you may answer it.  Otherwise, it is a sustained objection.

THE WITNESS:  My understanding, Walkers was counsel for CLO Holdco.

MR. PHILLIPS:  Your Honor, Mr. Patrick, the judge asked you to answer the question without reference --

THE WITNESS:  Oh.

MR. PHILLIPS:  -- to legal advice.

THE WITNESS:  Oh, okay.

MR. PHILLIPS:  If you can do that, it would be (inaudible).

THE WITNESS:  All right.  I can't.  Thank you.

BY MR. EDNEY:

Q   All right.  Mr. Patrick, last Thursday did you sit for a deposition with me asking questions?

A   Yes, I did.

Q   And during that deposition, did you tell the court reporter that your lawyers told you that you had no obligation to inform the charities of their dilution?

A   Yes.

Q   All right.  And aside from not having an obligation to inform them, you chose not to inform them anyway.  Isn't that right?

A   Correct.

Q   Now, after this transaction issuing new shares to DFW

Patrick - Direct                              47

Q    I see.  So Rand Advisors, LLC had an investment management
agreement relationship with Atlas IDF Fund, LP, too, didn't
it?

A    Yes.

Q    And you controlled Rand Advisors, LLC; isn't that right?

A    Yes.

Q    And did you draw compensation from your role at Rand
Advisors, LLC?

A    Personally?

Q    Yes, sir.

A    No.  Just holistically, my compensation's paid that way.
The management fees simply go to that -- that entity, and then
its ownership.

Q    Okay.  Who is the ownership of Rand Advisors, LLC?

A    I believe it's Charitable DAF Holdco Corporation, Inc.

Q    Okay.  And you control that company?

A    Yes, I do.

Q    And does that company pay you?

A    Yes.

Q    So let's just talk about your -- your compensation from
the DAF structure in 2024.  What entity would be providing
that compensation?  I'm not asking (inaudible), but where is
it paid out of?

A    Yeah.  It's -- generally speaking, it's paid out of
Charitable DAF Holdco Corporation, Inc.

Patrick - Direct                                48

Q    And that is a company that's part of the DAF structure; is that right?

A    Yes.

Q    Okay.  And that's a company that benefits from the Rand Advisor, LLC management; is that right?

A    Yes.

Q    Okay.  And Rand Advisors, LLC charges management fees to entities with which it has an investment management agreement; is that right?

A    Yes.

Q    And what -- how -- what are those fees running (inaudible)?

A    Oh, it's based upon the value of the asset that it manages.

Q    So it's like points or something like that?

A    I agree.

Q    Okay.  Now, you started the creation of new entities in the DAF structure around December 2024, didn't you?

A    Yes, generally speaking.  That is kind of a non-specific question, but yes.

Q    One of the first moves you made to reorganize the structure was you created a new general partner of Charitable DAF Fund, LP.  Isn't that right?

A    Yes.

Q    Prior to the winter of 2024, the general partner of

Patrick - Direct                                49

Charitable DAF Fund, LP was Charitable DAF GP, LLC.  Isn't that right?

A    Yes.

Q    And that was a Delaware company; is that right?

A    Yes.

Q    And you changed that general partner to a company called CDH GP, Ltd.  Isn't that right?

A    Yes.

Q    Let's go back to the previously-admitted Slide 19 with Exhibit 242.  So I -- is that the company reflected in green over at the left on Slide 19 in Exhibit 242?

A    Yes.

Q    And that company was created in the Cayman Islands; isn't that right?

A    Yes.

Q    Now, in 2024, Mr. Patrick, when you created this new general partner, you told your lawyer to design it in a way that would conceal its creation from any (inaudible).  Isn't that right?

A    I wouldn't characterize that email like that as far as the context.

Q    Okay.  And you told your lawyers to do it in a jurisdiction that would make it harder to hold you accountable for any future restructuring moves you might make.  Isn't that right?

Patrick - Direct                                    69

upward to Crown Global; is that right?

A    They haven't asked for it.  That is right.

Q    You didn't tell them that they were (inaudible)?

A    They received the same -- similar financial statements as -- as what you see here with respect to Atlas PDF.  But it -- so they haven't made a request.

Q    Let's go to Page 15 of the document.  All right.  So I take it you informed the auditors of Rand PE I Fund that the Beacon Mountain asset had been sold; is that right?

A    Yes.

Q    And do you see down at -- right above Paragraph 7 where it says LLC interests, fair market value, a million dollars?  Do you see that?

A    Yes.

Q    You sold Beacon Mountain out from Rand PE Fund for a million dollars; isn't that right?

A    Yes.

Q    Okay.

A    Yes.

Q    And the auditors then, their ability to value that asset was just based on the transaction price.  Isn't that right?

A    Yes.

Q    And you sold the Beacon Mountain asset to a company that you control, right, CLO Holdco, LLC?

A    Yes.  It was, for all intents and purposes, a sub-account

Patrick - Direct                              75

Q    Okay.  So you're not sure?

A    I'm not sure.

Q    Do you know where that cash is today, Mr. Patrick?

A    In the -- in the general accounts of the DAF.  But not specifically.

Q    When you say the general accounts of the DAF, do you mean Charitable DAF Fund, LP?

A    Yeah, and its constituent subsidiary entities.  It's in there.  Like the Prego commercial.

Q    In some bank account somewhere in the current DAF structure.  Is that right?

A    Yes.

Q    Okay.  Has any of it been spent?

A    Money is fungible.  So there's legal bills and -- so you could say it's spent.  It's -- or it's -- just, money is fungible.  So it's in the same pot with all the other assets, is how I kind of would think of it.

Q    Ballpark, Mr. Patrick, how much has the DAF entity spent on lawyers in 2026?

A    2026?  (Pause.)  I don't know precisely.  I would -- I'm speculating, but I'll give you an answer, roughly maybe five, six million.

Q    Okay.  What about in 2025?

A    Yeah.  Yeah.  I don't -- I don't know specifically.

Q    Is it more than $10 million?

Patrick - Direct                                        76

A    It could be.

Q    Is it more than $20 million?

A    No.  I would be very surprised by that.

Q    Okay.  2024?  Do you have a sense of how much was spent on lawyers then?

A    Yes.  I think that was around $12 million.

Q    Okay.  So about how many law firms has the Charitable DAF entity retained?

A    I would -- closer to a dozen than half a dozen.

        THE COURT:  Mr. Edney, I'm sorry to interrupt you, but we're at 11:00 o'clock.  We're going to take a 10-minute recess.  If you're wanting to catch a plane at 1:00 p.m., you're trying to get through this witness, we're going to need to move things along.

        MR. EDNEY:  Yes, Your Honor.

        THE COURT:  So I just want to make sure that the parties are aware of their own time management.  But we're going to take a 10-minute recess.

        MR. EDNEY:  Thank you, Your Honor.

        THE CLERK:  All rise.

    (A recess ensued from 11:01 a.m. until 11:15 a.m.)

        THE CLERK:  All rise.

        THE COURT:  You may be seated.

        A VOICE:  Your Honor, (inaudible) Mr. Edney, but there's also (inaudible).  (inaudible) to see what it is

Patrick - Direct                                    82

by Mercer.  And then an LTIP award that's awarded every three years.  And so part of that compensation was an LTIP that is based upon the value of the DAF from 2021 through the increase into the 2024 year, is my general recollection.

Q    So the answer to my question about how much the DAF entities paid you in 2024 is $10-1/2 million?

A    Yes.

Q    Okay.  And we did talk about your compensation in the deposition on Thursday, didn't we?

A    Yes, we did.

Q    And I asked you then whether you got paid more than $13 million in 2024, and you said you weren't sure.  Isn't that right?

A    That is correct.

Q    And why are you so certain of the $10-1/2 million number now?

A    Because I made an inquiry to confirm exactly what that number was.

Q    Did you review documents to do that?

A    No.

Q    Who did you ask?

A    I just called up Mr. Raver, the CFO of the DAF, and I asked him specifically how much was I paid in that year, and that's the number he gave me.

Q    Okay.  How much did the DAF entities pay you in 2025?

App. 113

Patrick - Direct                              83

A    In the year 2025, I received a bonus for the 2024 work. Paul Murphy awarded me a multiple of three.  On a Mercer bench scale of two to four, he awarded me a 3 off of my base of $850,000.  And that was paid in roughly February of 2025.  And then for the remainder of 2025, I should -- I received my base compensation of $850,000.

Q    Okay.  I mean, I appreciate the explanation, but can you give me a total number of compensation for 2025, please?

A    For 2025, yeah, it would be $850,000 plus $2,550,000, if I'm correct.  So add those two numbers together.

Q    So about $3.4 million; is that right?

A    I'm -- $850,000 plus $2.5 million, yes.

Q    Okay.  And how about for 2026, Mr. Patrick?

A    It's -- it's -- the award for the 2025 work awarded in 2026 was the same multiple and it's the same base.

Q    So you expect to make about $3.4 million in 2026?

A    Yes.

Q    And since its inception, Mr. Patrick, the DFW Charitable Foundation has given away less than a million dollars; is that correct?

A    Correct.

Q    All right.  Do you remember when we earlier talked about the Amended and Restated Partnership Agreement of Charitable DAF Fund, LP?

A    Yes.

App. 114

136

Let's continue to be respectful of each other and we can stop with the sidebars about counsel. I'd appreciate that. That's what's required of all attorneys and all of us.

So, okay. I understand your position. We'll deal with that come May 21st when you call him, if you're going to call him.

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay?

MR. EDNEY: Thank you, Your Honor.

THE COURT: All right. Anything further before we finish up today?

MR. EDNEY: Not from the Movant, Your Honor.

THE COURT: Anything from Highland? All right. With that, we will be adjourned.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 12:54 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording available of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                                    **05/13/2026**

_____    _____
Kathy Rehling, CETD-444                                Date
Certified Electronic Court Transcriber

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                              .   Case No. 19-34054-SGJ-11
                                    .
HIGHLAND CAPITAL MANAGEMENT,        .   Chapter 11
L.P.,                               .
                                    .
        Debtor.                     .
                                    .   Thursday, May 21, 2026
. . . . . . . . . . . . . . . . .   .   9:02 A.M.


TRANSCRIPT OF CONTINUED HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO
COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER
DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

                    Pachulski Stang Ziehl & Jones LLP
                    BY: JOHN A. MORRIS, ESQUIRE
                    1700 Broadway, Suite 36th Floor
                    New York, New York 10019

                    Willkie Farr & Gallagher LLP
                    BY: JOSHUA LEVY, ESQUIRE
                    787 Seventh Avenue
                    New York, New York 10019

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder:         Nicholas Noble
                        Earle Cabell Federal Building
                        501 West 10th Street
                        Dallas, Texas 75242

Transcription Service:  Liberty Transcripts
                        9107 Topridge Drive
                        Austin, Texas 78750
                        (847) 848-4907
                        DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Seery - Cross/Edney

agreements.

Q    All right.  The documents that you looked at were identified on Highland's exhibit list for that hearing, weren't they?

A    I believe they were.  Yes.

Q    As a matter of fact, further down in this hearing, you were asked what documents you looked at, correct?

A    I'm sure I was.  If you could show me it, I'm sure that that's the case.

Q    Yeah, if you go down to Lines 23 and 24.  Are those the documents that are in the exhibit list from 70 to 104?  Do you see that?

A    I see that it says that, yes.

Q    So --

        THE COURT:  Hold on one second, Mr. Edney.

        MR. MORRIS:  Your Honor, I object to this line of questioning.  The transcript is in evidence already.  It speaks for itself.  If he wants to impeach Mr. Seery and look at the transcript, by all means.  But otherwise, he should just be asking the questions, not just validating the transcript.

        THE COURT:  Response, Mr. Edney?

        MR. EDNEY:  Your Honor, I do think I am trying to hold Mr. Seery's testimony to his previous questions and answers in the May 19, 2025 hearing.  I think I am using it for an appropriate impeachment purpose.

App. 117

Seery - Cross/Edney

THE COURT:  I don't know the rule.  What I am going to say, if you can move this along.  I mean, we do have the transcript, but if you've got specific questions where you believe he's not answering the same way and you want to use this, go ahead.

MR. EDNEY:  All right.  Thank you, Your Honor.

BY MR. EDNEY:

Q    So the documents that you looked at to confirm Mr. Patrick's authority, they were listed on the exhibit list of Highland leading to that hearing, weren't they?

A    I believe so.  I said I'd have to check the actual numbers.  It looks like I'm cut off, but we tried to put everything into evidence at the 9019.  And we put on a very robust 9019 case by going through every one of the documents, but it was on direct and we didn't beat the dead horse.

Q    Fair enough.

MR. EDNEY:  Let's go to the exhibit list for the 9019 hearing filed by Highland on June 24, 2025.  If we could pull that up, please.

THE COURT:  I'm sorry, which exhibit is this, Mr. Edney?

MR. EDNEY:  It's not an exhibit.

THE COURT:  Okay.

MR. EDNEY:  It's for purposes of cross-examination.

THE COURT:  Okay.

App. 118

Seery - Cross/Edney

MR. EDNEY:  It's a filing in the main bankruptcy case, Your Honor.

All right.  If we could go to Page 8, please.

BY MR. EDNEY:

Q    There's a heading there that says "Patrick Authority."  Do you see that?

A    Yes.  And there's a series of exhibits that follow.

MR. EDNEY:  If we could scroll down to the next page, 9.  And then 10 and then 11.

BY MR. EDNEY:

Q    Then there's a heading break that says "Dugaboy Note."  Do you see that?

A    Yes.

Q    So Exhibits 70 through 104 are under the heading "Patrick Authority."  Do you see that?

A    I'm looking at the Dugaboy Note, but I saw it before.  Yes, 70 to 104 under the -- we broke this out so it would be really easy to understand in each of the categories of things we were covering.

Q    And Exhibits 70 through 104 were the exhibits, were the documents that you looked at, the organizational documents you looked at to confirm Mr. Patrick's authority.  Isn't that right?

A    I believe that's most of them, if not all.

Q    Okay.  As a matter of fact, you stated on the record back

App. 119

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/28/26   Page 158 of 167   PageID 924

48

Seery - Cross/Edney

in that hearing that those were the exhibits, Exhibits 70 through 104.

A     I stated those were the exhibits.  I don't know if that's every document I looked at, but I looked at all 34 of those documents.  Yeah.

        MR. EDNEY:  Okay.  All right.  Let's go up to the -- I think we're at the right page here.  As we do this, let's pull up side-by-side Exhibit 242, Slide 12, please.  Do we have that capability to do two at a time?

        Just bear with us for a second.  I promise this will speed things up.

     (Pause)

        MR. EDNEY:  All right.  That's good.

BY MR. EDNEY:

Q     Can you see both?

A     I can see both, but I apologize because it's going to be hard for me to read this.

Q     Yeah, we'll blow it up a touch.

     Okay, all right.  So one of the documents you reviewed was Exhibit 70, which was the trust agreement at Hunter Mountain, right?

A     Yes.

Q     And that's the Hunter Mountain Investment Trust in the second to bottom square on this chart.  Isn't that right?

A     Yes.  But to be clear, your chart's incorrect.  But okay

Seery - Cross/Edney

-- but that is in that box, yes.

Q    Okay.  And then at Exhibit 73, we have the Limited
Liability Company Agreement of Atlas IDF GP.  Do you see that?

A    Yes.

Q    And that entity is in green on this chart.  Isn't that
right?

A    Yes.

          MR. EDNEY:  Let's go to the next page of the exhibit
list.

BY MR. EDNEY:

Q    Now, Exhibits 75 through 85 are documents regarding HMIT,
right?  See that?

A    That's the appointment of Mark Patrick as the successor
administrator, yes.

Q    And then several organizational documents for Rand
Entities and Atlas Entities.  Do you see that?

A    Yes.  Just let me --

Q    If you can take him down to 85, please.

A    Some are consents.  Some are the constituent docs, yes.

Q    Okay.  But they all concern the Rand and Atlas Entities,
right?

A    I believe so looking at each of these headings, yes.

Q    And these entities, these --

A    Just to be clear, I'm looking at the list, not the
document.

App. 121

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document Appendix   Filed 07/28/26   131   Page 160 of 167   PageID 926

50

Seery - Cross/Edney

Q    Correct, right.  And these Rand and Atlas Entities, they are on this chart over here, Exhibit 242, Slide 15.  Aren't they?

A    I'd have to check each one, but you certainly have Rand Entities and you certainly have an Atlas entity.  And, again, there's so many mistakes in your chart, it's hard to use it. But you have those names listed, yes.

Q    All right.  So then if we go to the next page, Exhibit Numbers 86 through 93, those are also organizational documents from the various Rand and Atlas Entities.  Isn't that right?

A    Some are.  Some are other documents related to their organization are not organization or constituent documents, yes.

Q    But they all concern the Rand and Atlas Entities.  Isn't that right?

A    They are documents that concern those entities.  You're going up to what number?

Q    94.  93, I'm sorry.  86 through 93.

A    Yes.

Q    Okay.  And then Exhibit 94, that concerns Beacon Mountain, LLC.  Isn't that right?

A    Yes.

Q    As does Exhibit 95?

A    That's correct.

Q    And then Exhibits 96 through 100 concern the Okada Family

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/25/26   Page 161 of 167   PageID 927
Appendix   Page 105 of 131

51
Seery - Cross/Edney

Foundation, the Empower Dallas Foundation, and the Crown Global

Company.  Do you see that?

A    I see that, but those are Crown Global Policies.

Q    Uh-huh.

A    And a term sheet.

Q    But they concern the Crown Global Company, right?

A    I believe they concern the policy that the entities

Empower and Okada Family Trust purchased.  I don't believe they

concern the Crown Global Company.

Q    Okay.  They relate to the Crown Global Company, don't

they, Mr. Seery?

A    To the extent that a policy they issued relates to it.

Everything else you've shown is a constituent document, so if

you're trying to tie that to being constituent document, I

believe you know what that term means, these are not those.

Q    All right, Mr. Seery.  And the Crown Global Insurance

Company, the Empower Dallas Foundation, the Okada Family Trust,

they're listed over on the right of Slide 15 of Exhibit 242.

Do you see that in pink?

A    I see that you have them on your chart, yes.

Q    All right.  If we go to the next page, we have Exhibits

101 and 102.  Those relate to Crown Global, correct?

A    Again, those relate to the policies that Crown Global

issued, yes.

Q    And then we have two HMIT opinions from 2016.  Isn't that

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/28/26   Page 162 of 167   PageID 928
Appendix   Page 126 of 131

52

Seery - Cross/Edney

right?

A    Those are the opinion letters that were -- there's a rep letter, which is Dondero swearing that he's read the opinion and he abides by all of the representations in the opinion. And the opinion which blessed the Hunter Mountain, you know, tax scheme.

Q    Mr. Seery, were you aware that by the time of the June 25th hearing, that Hunter Mountain had been sold out of the stack of companies that the Rand PE Fund was a part of?

A    Certainly by the hearing, yes.  Hold on a second.  Can you repeat the question?  I think I misunderstood what you said.

Q    Sure.  By the time of the June 25th hearing, 2025, you were aware that Beacon Mountain and Hunter Mountain had been sold out of the stack of companies that involved Rand PE Fund I, L.P.  Isn't that right?

A    No.  So the interest in Beacon Mountain was sold from one -- I was aware that the interest in Beacon Mountain was sold from one entity that Patrick controlled to another entity that Patrick controlled called CLO Holdco, LLC.  It's on our chart that we used as a demonstrative and then your prior counsel used to cross in the 9019 hearing.

Q    Okay.  And after reviewing Documents 70 through 104 on this exhibit list, you concluded Mr. Patrick had complete authority to enter into the settlement agreement.  Isn't that right?

Seery - Cross/Edney

A     Yes.

Q     And you concluded that the proceedings in the Cayman Islands had no impact on Mr. Patrick's authority over any of the entities in the chain of entities that owned Hunter Mountain.  Is that right?

A     That's correct, yes.

Q     And you concluded that the relevant entities to Hunter Mountain run up to companies he owns and controls, and it's a structure that was set up a long time ago.  Is that right?

A     That's a pretty broad brush.  But I concluded that he had authority over each of the entities and these were entities that I wanted to have as counterparties to the settlement agreement.

Q     You had not concluded that the relevant entities to Hunter Mountain were in a structure that was set up a long time ago?

A     The Hunter Mountain structure was set up in 2015 to shelter hundreds of millions of dollars of income from taxes that Dondero and Okada were going to be hit with.  So I'm very familiar with the structure.

Q     All right.

A     It was set up in 2015.  Yeah, that's I guess a pretty long time.

        MR. EDNEY:  Let's go to Exhibit 35.  Page 99, please.

BY MR. EDNEY:

Q     All right.  Going to Line 13.  At the June 25, 2025

Case 19-34054-sgj11   Doc 4684-1   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Case 3:22-cv-00203-S   Document 51   Filed 07/28/26   131 Page 164 of 167   PageID 930
Appendix   Page 128 of

54
Seery - Cross/Edney

hearing, were you asked the following question, "So based on the work that you did and the documents you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT Entities?"  And your answer was "Yes."  Do you see that?

A     Yes.

Q     And then were you asked the question, "What view did you reach?"  And the answer follows, "He has complete authority over each of these entities.  They run up to entities that he controls or he owns, and he's had that.  It's a structure that was set up a long time ago, and any changes to that structure are consistent with the documents that let him do those things."  Did I accurately read that question and answer?

A     Yes.

Q     Did the Hunter Mountain Entities concern a structure that was set up a long time ago?

A     That's exactly what I just testified to in 2015.

Q     All right.  And you concluded that the Dallas Foundation had no rights with respect to the -- at all with respect to the management of these entities because Crown Global had only issued an annuity policy.  Isn't that right?

A     It was the entire structure of the Crown policy and the layers that they separated those entities from control of the entity.  Yes, they had no voting, no consent.  Virtually no rights at all, other than to receive the payments from Crown.

Seery - Cross/Edney

Q    But by the time of this testimony, Hunter Mountain and Beacon Mountain had been sold out from under the Crown Global structure.  Isn't that right?

A    Again, you keep doing this, and it's not fair and it's not correct.  Be specific.  Hunter Mountain, the interest in Beacon Mountain was sold.  Yes.

Q    And it was sold away from the Crown Global structure. Isn't that right?

A    It was sold away -- I've got to look back at the structure.  It was sold by Rand through the multiple layers of the structure.  And they didn't have any rights to consent. And it was between two entities that Mr. Patrick controlled.

     I'm not trying to be difficult.  That's exactly what I testified to.  That's what the documents say, and that's what we've done.  And as you know, the Dallas Foundation objection and withdrew their objection, so go ahead.

Q    Before entering into the settlement agreement, did you ask Mr. Patrick to provide Highland with any of the documents from the Cayman Islands proceedings concerning the Charitable DAF?

A    I don't -- I don't know.  I know I had some of them.  I had the supervision application, for sure.  I don't know that I asked him to provide them.  I don't know where I got them.  I think we may have gotten those elsewhere, but I don't know.

Q    All right.  Now, Mr. Morris asked you a question about whether the liquidators had been in touch with you regarding

App. 127

Case 19-34054-sgj11    Doc 4684-1    Filed 06/29/26    Entered 06/29/26 23:26:09    Desc
Case 3:22-cv-00203-S    Document 51    Filed 07/30/26    Page 166 of 167    PageID 932
Appendix    Page 130 of 131

56

Seery - Cross/Edney

the potential settlement prior to the June 25th hearing, right?

A    If he -- no, he asked me if they had been in touch with me prior to June 24th.

Q    I see.

A    No, that's the question he asked.  You can look at the transcript.  You can see or not see.  You don't have to be snide with me.  I'm sorry, Your Honor.

THE COURT:  Yeah.  Let's make sure both for witness and attorney, let's make sure that we're keeping our comments professional and we don't need snide marks.

BY MR. EDNEY:

Q    So did they get in touch with you on June 24th, 2025?

A    I received a letter, it's in evidence, that came on June 24th for -- it may have come late and I might have gotten it the morning of the 25th.

Q    And what did that letter say?

A    That letter said, we're aware of the transactions that were the -- we've seen the CDMCFAD that collapsed on the DAF side, a number of entities, and that removed those DAF structures from the entity that the JOLs were now appointed for.  So they were aware of the redemption -- the dilution and redemption transaction, as they've so described, and asked for a 45-day stay of the hearing.

Q    So did the Cayman Island Liquidators ask the Court to delay the approval of the settlement agreement for 45 days?

CERTIFICATE

        I, DIPTI PATEL, court approved transcriber, do hereby

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and transcribed to the best of my

ability.

_____

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts                Date:  May 26, 2026